IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<pre>
                            *
UNITED STATES OF AMERICA,
                            *
        Plaintiff,
                            *
        v.                       Criminal No.: WDQ-13-035
                            *
KAREN KIMBLE,
                            *
        Defendant.
                            *
</pre>

*    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Karen Kimble[1] is charged in a 21-count indictment with wire fraud in violation of 18 U.S.C. § 1343 (counts one to six), tax fraud in violation of 26 U.S.C. §§ 7206(1)-(2) (counts seven to sixteen), aggravated identity theft in violation of 18 U.S.C. § 1028A (counts seventeen to twenty), and visa application fraud in violation of 18 U.S.C. § 1546(a) (count twenty-one). ECF No. 1. On July 30, 2014, Kimble waived her Sixth Amendment right to a jury trial. ECF No. 73. On January 26 and 27, 2015, the Court conducted a bench trial and heard evidence on pending motions. ECF Nos. 76, 77.[2] By way of the accompanying Verdict,

---

[1] Kimble is also known as "Karen Kimble-Mamah" and "Karen Mamah." ECF No. 1 ¶ 1.

[2] On April 14, 2014, the Court granted Kimble's motion for a psychiatric evaluation. ECF Nos. 63 (sealed), 64 (sealed). On June 11, 2014, the Court received Kimble's evaluation prepared by Michael J. O'Connell, Ph.D., ABPP-F, which deemed Kimble

and for the following reasons, this Court will find Defendant

Karen Kimble guilty on all counts.

I.   Findings of Fact[3]

This case arises from several tax returns Kimble filed with

the Internal Revenue Service ("IRS") and State of Maryland from

competent to stand trial.  On the morning of trial, Kimble's
counsel stated that Kimble accepted Dr. O'Connell's findings and
urged the Court to find Kimble competent to stand trial.  Tr.
3:13-18.  The Court inquired of Kimble's counsel whether Kimble
had adequately assisted him in preparing her defense.  Tr. 3:19-
22.  Kimble's counsel said that she had not, but that her lack
of willingness to assist him had "nothing to do with her
competency."  Tr. 3:22-4:15.

A defendant is not competent to stand trial if she suffers from
"a mental disease or defect" that makes her unable to: (1)
"understand the nature and consequences of the proceedings
against [her]" or (2) "assist properly in [her] defense."  18
U.S.C. § 4241(d).  In measuring a defendant's understanding of
the proceeding against her, "it is not enough for the district
judge to find that the defendant is oriented to time and place
and has some recollection of events."  *Dusky v. United States*,
362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks
omitted).  The defendant must have both a rational and factual
understanding of the proceeding.  *Id.*  When counsel have raised
concerns about competency, their "first-hand evaluation[s] of a
defendant's ability to consult on his case and to understand the
charges and proceedings against him may be as valuable as an
expert psychiatric opinion."  *United States v. David*, 511 F.2d
355, 360 (D.C. Cir. 1975).

In light of Dr. O'Connell's detailed evaluation and finding that
Kimble is competent to stand trial, Kimble's acceptance of that
report, and Kimble's counsel's opinion that Kimble's lack of
assistance is not competency-related, the Court adopted Dr.
O'Connell's report and found Kimble competent to stand trial.
Tr. 4:25.

[3] The facts are from the transcript of the trial testimony (ECF
Nos. 80, 81) ("Tr.") and the trial exhibits.

2008 to 2012, and an Immigration Form I-130 (Petition for Alien Relative) Kimble submitted in 2008 to U.S. Customs and Immigration Services ("USCIS").  As required by Federal Rule of Criminal Procedure 23(c), the Court makes the following findings of fact:

Megan Cheswick's and Judith Fendlay's Tax Returns

1.   Megan Cheswick[4] worked with Kimble at the T. Rowe Price Participant Services Center.  Tr. 68:23, 70:7-8.

2.   After they became friends, Kimble told Cheswick she was a "certified tax preparer," had a Master's Degree in Business Administration, and offered to prepare Cheswick's taxes free of charge.  Tr. 72:9-25, 73:1, 73:18.

3.   Kimble further told Cheswick that she had experience preparing taxes for small businesses and others at T. Rowe Price, and her tax preparation business was called "Fiscally Yours."  Tr. 73:8-12.

4.   Cheswick gave Kimble a complete set of tax documents[5] each year that she asked Kimble to prepare her taxes (2007, 2008, 2009, 2010, and 2011).  Tr. 74:24; Gov. Ex's 3a, 3b, 3d, 3f, 3h; Gov. Ex. 12 ¶ 4.

---

[4] In 2009, Cheswick got married and changed her last name to "Wenner."  Tr. 72:5-8.

[5] Including her W-2s, Forms 1099, and investment documents.  Tr. 73:21-23, 74:1-24.

5.   Kimble told Cheswick that she prepared her taxes using
     Turbo Tax, signed them as the tax return preparer in case
     Cheswick was audited, and used the e-mail address
     erato24k@hotmail.com to file the tax returns with Turbo
     Tax.  Tr. 76:25, 77:1-3, 80:7-11; Gov. Ex. 12 ¶ 5.

6.   Kimble did not ask Cheswick to review her return for
     accuracy before she filed it, and gave Cheswick a Turbo Tax
     summary printout after the tax return had been filed.  Tr.
     77:7-12.

7.   Kimble prepared and electronically filed[6] Cheswick's 2010
     federal tax return.  Tr. 76:23-25, 78:23-79:6; Gov. Ex 3g.

8.   Kimble claimed $11,250 in unreimbursed business expenses,
     $375 in tax preparation fees, and $671 in attorney
     accounting fees, none of which Cheswick had.  Gov. Ex. 3g,
     line 21, Schedule A; Tr. 86:7-12, 87:6-17.

9.   Kimble claimed a total of $36,131 in itemized deductions;
     the correct amount was $13,038.  Gov. Ex. 3g, line 40; Gov.
     Ex. 8g at 14.

---

[6] Kimble stipulated that each tax return at issue in this case
travelled electronically and in interstate commerce, and she
used the email account erato24k@hotmail.com and
erato24k@yahoo.com during the time alleged in the indictment.
Gov. Ex. 12 ¶¶ 5-6.  Each tax return travelled by wire in
interstate commerce, beginning in Maryland, travelling to
California, and then to Massachusetts.  Gov. Ex. 9r; Tr. 324:1,
348:14-15, 350:3-5.

10.  Cheswick did not authorize Kimble to file a return with false expenses and deductions.  Tr. 87:18-20.

11.  Cheswick's 2010 federal tax return generated an inflated $6,233 refund.  Gov. Ex. 3g, Line 74a; Tr. 188:2-6.

12.  Kimble diverted $1,300 of Cheswick's refund into her ING Bank account ending in 7686, without Cheswick's permission. Gov. Ex. 3g, Form 888; Gov. Ex. 9o; Gov. Ex. 12 ¶ 7; Tr. 85:22.

13.  Cheswick referred her then-husband's grandmother, Judith Fendlay, to Kimble, as she had recently retired from the Maryland Transportation Authority and needed assistance preparing her now-complicated tax returns.  Tr. 80:24-81:10, 99:20, 100:8-15.

14.  Kimble charged Fendlay $25 to prepare her state and federal tax returns.  Tr. 101:1-5.

15.  Cheswick delivered Fendlay's tax preparation documents to Kimble at work.  Gov. Ex. 4a; Tr. 81:7-10.

16.  On February 18, 2010, Kimble electronically filed Fendlay's 2009 federal tax return using her email account erato24k@hotmail.com.  Gov. Ex. 4e; Gov. Ex. 9s at 1; Tr. 347:7-14, 21-25.[7]

---

[7] Kimble used Fendlay's name, address, and social security number to prepare the 2009 federal tax return, and filed it

17.   Kimble did not allow Fendlay to review her tax return
      before it was filed.  Tr. 103:24, 105:20.

18.   Kimble included the following expenses on Fendlay's 2009
      federal tax return, none of which Fendlay had or told
      Kimble she had: $7,689 in medical expenses, $13,188 in home
      mortgage interest,[8] $2,652 in mortgage insurance premiums,
      $1,192 in gifts to charity, $2,124 in unreimbursed business
      expenses, $60 in union and professional dues, $225 in tax
      preparation fees, $230 in uniform expenses, $175 in job
      search costs, $125 in resume builder fees, $1,205 in
      parking fees, and $234 in business expenses.  Gov. Ex. 4e,
      line 40a, Schedule A; Tr. 106:21-109:3.

19.   In total, Kimble falsely claimed $30,399 in itemized
      deductions[9] on Fendlay's 2009 federal tax return.  Gov. Ex.
      4e, Schedule A; Gov Ex. 8d at 6; Tr. 109:9, 186:18-24,
      338:8-339:25.

20.   Fendlay's 2009 federal tax return generated a $7,223
      refund, which Kimble had deposited into her ING Bank

---

electronically using Fendlay's name and date of birth.  Tr.
105:21-106:10, 110:17.

[8] Fendlay owns her home outright.  Tr. 107:3-8.

[9] The correct amount was zero.  Gov. Ex. 8d at 6.

account ending in 7686 without Fendlay's permission.  Gov.
Ex. 4e, Lines 73a, 73d; Gov. Ex. 9o; Tr. 109:21.

21.  The correct refund amount was $1,121.  Gov. Ex. 9q.

22.  Kimble wrote Fendlay a note explaining that she would
receive one $2,485 check for her federal and state tax
returns.  Gov. Ex. 4d; Tr. 104:25.[10]

23.  Fendlay received one $2,485 check for her federal and state
tax returns.  Tr. 105:11-13.

24.  Fendlay did not prepare, electronically sign, or file her
2009 federal tax return, and did not authorize Kimble to
file the return listing false deductions or expenses.  Tr.
110:18-111:1.

25.  Kimble gave Fendlay a different tax return that she had
purportedly filed for Fendlay, which stated that Fendlay
owed $759 in federal taxes for 2009.  Gov. Ex. 4b; Tr.
111:5-12.

26.  Kimble signed the "dummy"[11] tax return as Fendlay's paid
preparer, and listed herself as the "Third Party Designee"

---

[10] Kimble initially gave Fendlay a "dummy" tax return purportedly
filed with the IRS stating that Fendlay owed $759 in federal
taxes.  Gov. Ex. 4b, line 75.  Kimble then wrote Fendlay a note
explaining that there had been a change to the return after
amendments to Fendlay's Maryland tax return.  Gov. Ex. 4d.

[11] A "dummy" tax return is one that Kimble gave her clients that
looks like an actual tax return, includes accurate information,

along with her telephone number.  Gov. Ex. 4b; Tr. 111:16-
24.

27.  Kimble's name does not appear as the Third Party Designee
or the paid preparer on the return actually filed with the
IRS.  Gov. Ex. 4e.

28.  Fendlay gave Kimble her tax-related documents to prepare
her 2010 federal tax return.  Gov. Ex. 4h; Tr. 112:24-
113:2.

29.  On February 27, 2011, Kimble electronically filed Fendlay's
2010 federal tax return from her email account
erato24k@yahoo.com; Kimble used Fendlay's name, address,
social security number, and date of birth to prepare and
electronically sign the return.  Gov. Ex. 4m; Tr. 113:22-
114:4, 116:25, 349:4-5.

30.  Kimble claimed several false deductions on Fendlay's 2009
federal tax return: $1,158 in medical expenses, $10,759 in
home mortgage interest, $2,714 in mortgage insurance
premiums, $325 in gifts to charity, and $390 in tax
preparation fees.  Gov. Ex. 4m, Schedule A; Tr. 114:9-
115:2, 341:2-344:2.

---

and appeared to have been filed with the IRS, but which she did
not file with the IRS.

31.  In total, Kimble claimed $19,953 in itemized deductions.
     Gov. Ex. 4m, line 40a.[12]

32.  Kimble also claimed a false $4,000 education expense.  Gov.
     Ex. 4m, Form 8863; Tr. 116:11-17.

33.  Fendlay did not have, nor did she tell Kimble that she had,
     $19,953 in itemized deductions, and did not authorize
     Kimble to file the tax return with the false deductions.
     Tr. 115:8, 117:2-7.

34.  The false deductions generated a $5,306 refund, which
     Kimble had deposited into her ING bank account ending in
     7686.  Gov. Ex. 4m, lines 74a, 74d; Gov. Ex. 9o.

35.  The correct refund amount was $2,583.  Gov. Ex. 9q.

36.  Fendlay did not authorize Kimble to deposit her refund into
     Kimble's bank account, nor did Fendlay receive any of the
     $5,306 refund.  Tr. 115:13-17.

37.  Kimble did not list herself as Fendlay's paid preparer on
     the tax return filed with the IRS.  Gov. Ex. 4m.

38.  Through Cheswick, Kimble gave Fendlay a copy of the 2010
     federal tax return she had purportedly filed, which stated
     that Fendlay was entitled to a $5 refund.  Gov. Ex. 4i,
     Line 74a; Tr. 117:8-24.

---

[12] The correct amount was zero.  Gov. Ex. 8d at 11.

39.   The copy provided to Fendlay listed Kimble as her paid preparer.  Gov. Ex. 4i.

40.   Kimble also electronically filed Fendlay's 2010 Maryland tax return.  Gov. Ex. 4n; Gov. Ex. 9s at 16; Tr. 118:13, 324:1-3, 328:17-24.

41.   The false deductions on the federal tax return carried over to the Maryland tax return, resulting in a $19,052 deduction.  Gov. Ex. 4n.

42.   The tax return Kimble filed with the State of Maryland stated that Fendlay was entitled to a $901 refund, which corresponded to the amount of taxes Fendlay had paid. Gov. Ex. 4n at 4.

43.   Kimble gave Fendlay a different copy of her Maryland tax return also stating that she was entitled to a $901 refund. Gov. Ex. 4j; Tr. 118:15-119:4.

44.   In June 2011, Fendlay received a letter from the IRS stating that "[t]he income and payment information . . . that we have on file does not match entries on your 2009 Form 1040," and if the IRS's information was correct, Fendlay owed $811.  Gov. Ex. 4k; Tr. 119:21.

45.   Fendlay called Kimble, who told her that it was a mistake made by her colleague, and that she would take care of it; however, Kimble did not take care of it.  Tr. 120:21-25.

46.  After Fendlay received the letter from the IRS, Cheswick
     logged in to Turbo Tax using the credentials Kimble had
     provided to view her and Fendlay's tax returns.  Tr. 83:19-
     84:6.

47.  Cheswick learned that portions of her and Fendlay's tax
     refunds had been deposited into an ING Bank account, and
     that the returns had been marked as "self-prepared."  Tr.
     84:6-20, 89:8.

48.  In February 2012, Cheswick sent Kimble a text message
     asking why her tax returns had been marked "self-prepared";
     Kimble responded, "I do sign them. . . . [I'm] so surprised
     & hurt that u think I would steal from u or his
     grandmother. . . . Also I wouldn't put everything on line
     for you if I had done something wrong. [I'm] not a thief
     but am pretty sure they hide things like that lol."  Gov.
     Ex. 3j; Gov. Ex. 12 ¶ 3; Tr. 88:23-24.

49.  Kimble then left Cheswick a series of voicemails stating
     that the $7,000 refund amount at issue in Fendlay's 2009
     return was "completely not correct," Cheswick was concerned
     about "misinformation," and Kimble had sent $500 to
     Fendlay.  Gov. Ex. 3l; Gov. Ex. 3n; Gov. Ex. 12 ¶ 3.

50.  Fendlay never received any money from Kimble.  Tr. 90:16-
     17.

11

Alexis Thompson's Tax Returns

51.  Kimble prepared 2008, 2009, and 2010 federal and state tax
     returns for another T. Rowe Price colleague, Alexis
     Thompson.   Tr. 145:17-19,150:22-24, 158:3-5.[13]

52.  Thompson gave Kimble her W-2 and IRA statement for the 2009
     tax year.   Gov. Ex. 6f; Tr. 151:3-12, 168:11-19.

53.  Thompson's name was not on the title of the home in which
     she lived; Thompson never gave Kimble a mortgage interest
     statement.   Tr. 144:15-21, 168:8-10.

54.  Thompson was not a student, and did not have a student
     loan; she never gave Kimble information indicating that she
     qualified for a student loan interest deduction.   Tr.
     153:3-13.

55.  On February 24, 2010, Kimble electronically filed
     Thompson's 2009 federal tax return from her email account
     erato24k@yahoo.com; the tax return included Thompson's
     name, address, date of birth, and social security number.
     Gov. Ex. 6h at 11; Gov. Ex. 9s at 11; Tr. 157:16-158:1,
     349:7-8.

---

[13] Thompson did not pay Kimble for her tax preparation services,
but took Kimble out for lunch.  Tr. 149:12-15.  On one occasion,
Thompson gave Kimble some cash because she had provided a
service that Thompson was unable to perform.  Tr. 149:15-17.

56.   Kimble included several false deductions on Thompson's 2009
      federal tax return: $2,385 in real estate taxes, $140 in
      personal property taxes, $11,483 in mortgage interest
      deduction, $2,474 in student loan interest,[14] $571 in
      mortgage insurance premiums, $725 in charitable
      contributions, $140 in tax preparation fees, $600 in
      attorney accounting fees, and $764 in unreimbursed business
      expenses, including union and professional dues, job search
      costs, resume building costs, and costs of professional
      publications and licensing materials.  Gov. Ex. 6h, line
      33, Schedule A; Tr. 153:3-13, 154:8-155:18-157:3.[15]

57.   The false deductions resulted in $18,430 itemized
      deductions,[16] and a $1,653 refund.  Gov. Ex. 6h, lines 40a,
      72; Tr. 153:14-25, 157:4-7.

58.   Thompson actually owed $1,482 in federal taxes.  Gov. Ex.
      9q.

---

[14] Kimble also listed a false student loan interest deduction on
Thompson's 2008 federal tax return.  Gov. Ex. 6c, line 18; Tr.
145:17-22, 148:1-14.

[15] Thompson never authorized Kimble to use her name, address,
date of birth, and social security number to file a fraudulent
tax return, and was unaware that she had done so.  Tr. 164:2-6.

[16] This amount is $16,229 more than it should have been.  Gov.
Ex. 8c at 10; Tr. 186:9-17.

59. Thompson never received the $1,653 refund; instead, Kimble gave her $136 cash.  Tr. 157:11.

60. Kimble told Thompson that she would set up an account for her so that Thompson could receive her refund in cash.  Tr. 157:12-15, 166:11-167:4.

61. Kimble directed the $1,653 refund to a bank account ending in 9119; from there it was transferred to her ING Bank account ending in 7686.  Gov. Ex. 6h, line 73d; Gov. Ex. 9o; Tr. 332:11–333:3, 335:13-17, 335:22–336:15.

62. Kimble gave Thompson a "dummy" 2009 federal tax return showing a refund amount of $136, and which listed Kimble as the paid preparer.  Gov. Ex. 6g; Tr. 151:15-152:1.

63. The return Kimble filed with the IRS indicated that it had been self-prepared.  Gov. Ex. 6h.

64. In September 2010, Thompson received an IRS letter questioning the income and payment information claimed on her 2008 federal tax return, and stating that she owed $381.  Gov. Ex. 6e; Tr. 149:19-150:7.

65. The IRS told Thompson that it had not received information indicating that she had been in school and had been entitled to the student loan interest deduction.  Tr. 150:11-14.

66. Kimble gave Thompson $381 to pay the IRS.  Tr. 150:15-20.

14

67. On April 15, 2011, Kimble electronically filed Thompson's 2010 federal tax return. Gov. Ex. 6k; Tr. 349:12-16.[17]

68. Thompson had given Kimble her W-2, a dividend statement, an IRA statement, and a letter confirming a $255 charitable donation. Gov. Ex. 6i; Tr. 158:10-159:4.

69. Kimble claimed $17,561 in itemized deductions on Thompson's 2010 federal tax return,[18] including: $3,600 in real estate taxes, $86 in personal property taxes, $10,000 in mortgage interest,[19] $775 in mortgage insurance premiums, $771 in charitable donations, and $529 in job expenses. Gov. Ex. 6k, line 40, Schedule A; Tr. 160:22-162:16.

70. Kimble also claimed a false education credit of $1,514. Gov. Ex. 6k, line 49; Tr. 162:18-163:6.

71. The false deductions and credits generated a $6,156 refund; the correct amount was $63. Gov. Ex. 6k, line 72; Gov. Ex. 9q.

---

[17] Kimble used Thompson's name and date of birth to electronically file the tax return. Gov. Ex. 6k; Tr. 163:19-164:1.

[18] The correct amount was $2,325. Gov. Ex. 8c at 13.

[19] Thompson never gave Kimble a mortgage interest statement because the mortgage and title were in her husband's name, and Kimble had not filed the tax return in Thompson's husband's name. Gov. Ex. 6k; Tr. 114:18-21, 168:8-10.

72.   Kimble directed the $6,156 refund to her Susquehanna Bank
      account ending in 3895.  Gov. Ex. 6k, line 74d; Gov. Ex.
      9o.

73.   Kimble did not complete the paid preparer section of the
      tax return filed with the IRS.  Gov. Ex. 6k.

74.   Kimble gave Thompson a "dummy" return stating that she was
      entitled to a $5,153 refund, and listing Kimble as the paid
      preparer. Gov. Ex. 6j, line 74a; Tr. 159:5-13.

75.   Kimble gave Thompson $5,153 in cash.  Tr. 159:23-160:4.

James Woodland's Tax Returns

76.   In 2009, James Woodland graduated from Sparrows Point High
      School in Baltimore, Maryland.  Tr. 169:24-170:4.

77.   From 2009 to 2012, Woodland dated Kimble's daughter,
      Leighann Kimble, and occasionally spent the night at
      Kimble's home.  Tr. 170:5-171:4.

78.   Woodland listed Kimble's address as his home address for
      his employment at the Owings Mills, Maryland, Sam's Club;
      Woodland's mother lived in Pennsylvania, and he thought he
      would be more likely to get the job if it appeared that he
      lived closer.  Tr. 171:11-18.

79.   Although Woodland had Sam's Club send his W-2 to Kimble's
      address, he never received it.  Gov. Ex. 7b; Tr.  171:21-
      23.

80.  Woodland initially agreed to have Kimble file his taxes for
     him, but changed his mind after speaking with his mother,
     who told him that he should not file taxes because he was
     not going to get much money back.  Tr. 172:1-9.[20]

81.  Woodland did not authorize Kimble to file tax returns for
     him.  Tr. 172:10-12, 174:3, 176:25.

82.  Although the tax return indicates that it was self-
     prepared, Woodland did not prepare or electronically sign
     his 2010 federal tax return.  Gov. Ex. 7a; Tr. 173:21-
     174:14.

83.  On February 19, 2011, Kimble electronically filed
     Woodland's 2010 federal tax return from her email account
     erato24k@hotmail.com; Woodland's social security number had
     been used to electronically sign the return.  Gov. Ex. 7a;
     Gov. Ex. 9s at 29; Tr. 174:6-12, 349:18-21.

---

[20] Kimble contends that Woodland's testimony that he decided not
to file his taxes "stretches believability . . . [; t]here is no
[20] year old working at Sam's Club and sleeping on his
girlfriend's sofa that would not want a person to fill out his
tax return in exchange for receiving $50."  ECF No. 87 at 8-9.
Kimble concedes, however, that Woodland's testimony "is
uncontroverted," *id.* at 8; further, it is the exclusive province
of the factfinder to make credibility determinations, *see, e.g.,*
*United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989), and
a factfinder "may base its verdict on any testimony not
'unbelievable on its face' or 'so contrary to the teachings of
human experience that no rational person could believe in it.'"
*United States v. Elswick*, 306 F. App'x 8, 10 (4th Cir. 2008)
(unpublished)(*quoting United States v. Catalan-Vazquez*, 211 F.
App'x 864, 866 (11th Cir. 2006)(unpublished)).

84.  Woodland identified his full name, social security number,
     and approximate income from his job at Sam's Club on the
     tax return.  Gov. Ex. 7a; Tr. 172:20-173:6.

85.  Kimble claimed a $5,700 deduction on the tax return,
     instead of the $4,750 standard deduction.  Gov. Ex. 7a,
     line 40; Gov. Ex. 8l at 1.

86.  Kimble also claimed a false $340 student loan interest
     deduction and $1,000 American Opportunity credit.  Gov. Ex.
     7a, lines 33, 66; Tr. 393:18-394:16.

87.  Woodland's 2010 federal tax return generated a $1,333
     refund.  Gov. Ex. 7a, line 74a.

88.  Kimble directed the $1,333 refund to her Susquehanna Bank
     account ending in 3895.  Gov. Ex. 7a, line 74d; Gov. Ex.
     9o; Gov. Ex. 12 ¶ 7.

89.  Woodland never received the $1,333 refund.  Tr. 173:14.

90.  Woodland was not entitled to a $1,333 refund.  Gov. Ex. 8l;
     Gov. Ex. 9q; Tr. 340:20-341:1.

91.  Woodland did not file his 2010 Maryland tax return, nor
     authorize Kimble to file it for him.  Tr. 174:21-24.

92.   In or about February 2010, Kimble electronically filed

Woodland's 2010 Form 503 (Maryland Resident Income Tax

Return).   Gov. Ex. 7c.[21]

93.   Woodland identified his name and social security number on

his 2010 Maryland tax return.   Gov. Ex. 7c; Tr. 175:4-8.

94.   Although it had been marked "self-prepared," Woodland did

not sign the 2010 Maryland tax return purporting to bear

his signature.   Gov. Ex. 7c; Tr. 175:18.

95.   The phone number ending in 4508 on Woodland's 2010 Maryland

tax return belonged to Kimble.   Gov. Ex. 7c; Gov. Ex. 4d;

Tr. 105:5-10.

96.   Woodland's 2010 Maryland tax return generated a $163

refund, which was deposited into Kimble's ING Bank account

ending in 7686.   Gov. Ex. 7c, lines 21, 24c.

97.   Woodland never received the $163.   Tr. 175:15.

---

[21] As previously noted, Kimble stipulated that she "submitted to
the [IRS] and State of Maryland electronically and in interstate
commerce" each tax return entered into evidence.   Gov. Ex. 12 ¶
6.   Woodland's 2010 Maryland tax return was not signed
electronically, and the government did not submit other evidence
of electronic filing; for example, a record of the electronic
filing.   *Cf.* Gov. Ex. 9s at 29 (Intuit record of electronic
filing of Woodland's 2010 federal tax return).   However, "[b]y
so stipulating, [Kimble] waive[d] the requirement that the
government produce evidence (other than the stipulation itself)
to establish the facts stipulated to beyond a reasonable doubt."
*United States v. Muse*, 83 F.3d 672, 678 (4th Cir. 1996)("A
defendant is not allowed to produce evidence to contradict or
challenge the existence of facts to which he has validly
stipulated.").

Zorka Kuljich's Tax Return

98.   Zorka Kuljich worked with Kimble at T. Rowe Price.  Tr.
      123:14-124:17.

99.   After withdrawing IRA funds to purchase a condominium,
      Kuljich needed someone to prepare her taxes.  Tr. 125:19-
      23.

100.  When Kuljich asked Kimble if she knew anyone who prepared
      taxes, Kimble said she did; Kuljich paid Kimble $50 to
      prepare her 2010 federal tax return.  Tr. 124:20-125:18.

101.  Kuljich gave Kimble several documents to prepare her tax
      return: her W-2, a letter confirming a $50 charitable
      donation, a 1099 savings account interest statement from
      Howard Bank, a 1099 dividend and distribution statement
      from T. Rowe Price, an IRA distribution statement showing a
      $10,000 withdrawal, an income statement for her state tax
      refund from the previous tax year, a Fidelity IRA
      statement, and a mortgage interest statement showing that
      Kuljich paid $4,410.22 in mortgage interest during the 2010
      tax year.  Gov. Ex. 5b; Tr. 125:25–128:4.

102.  On April 15, 2011, Kimble electronically signed and filed
      Kuljich's 2010 federal tax return using Zuljich's date of
      birth.  Gov. Ex. 5d at 11; Tr. 349:22-350:5.

103. Kimble used Zuljich's name, address, and social security
     number to prepare the return.  Tr. 130:17-131:2.

104. Kimble falsely claimed $25,189 in itemized deductions:[22]
     $5,040 in real estate taxes, $145 in personal property
     taxes, $16,049 in mortgage interest, $1,090 in charitable
     contributions, $210 in tax preparation fees, and $792 in
     attorney accounting fees.  Gov Ex. 5d, line 40a, Schedule
     A; Tr. 132:3-135:4, 189:15-190:2.

105. Kimble also claimed a false $1000 education credit.  Gov.
     Ex. 5d, line 66; Tr. 135:5-15.

106. The false entries resulted in a $4,389 refund.  Gov. Ex.
     5d, line 72.

107. Zuljich actually owed $2,425 in federal taxes.  Gov. Ex.
     9q.

108. Zuljich received $389 by direct deposit to her bank
     account; the remaining $4,000 went to Kimble's ING Bank
     account ending in 7686.  Gov. Ex. 5d, Form 8888; Gov. Ex.
     5f; Gov. Ex. 9o; Tr. 136:4-15.

109. Kimble gave Zuljich a "dummy" tax return that did not
     include the itemized deductions, and which stated that
     Zuljich was entitled to a $389 refund, and Kimble was the
     paid preparer.  Gov. Ex. 5c; Tr. 128:5-12, 129:5-23.

---

[22] The correct amount was $8,654.  Gov. Ex. 8k at 4.

110.   Kimble did not state that she was a paid preparer on the tax return filed with the IRS.  Gov. Ex. 5d.

111.   Zuljich never authorized Kimble to use her name, address, date of birth, and social security number to file the tax return containing false entries, and did not know she had. Tr.  137:13-20.

## Karen Kimble's Tax Returns

112.   On January 31, 2008, Kimble electronically signed[23] under penalty of perjury and filed her 2007 federal tax return. Gov. Ex. 9j at 3, 16; Tr. 352:22-24.

113.   The paid preparer section of the tax return had not been completed, indicating that the return had been self-prepared, and Kimble checked "no" when asked if she wanted to authorize a third party to discuss the return with the IRS.  Gov. Ex. 9j.

114.   Kimble claimed $3,538 in real estate taxes and $20,003 in home mortgage interest, when she had paid $1,273.79 and $3,375, respectively.  Gov. Ex. 9j, Schedule A; Gov. Ex. 9t; Gov. Ex. 8b; Tr. 353:20-355:8.

---

[23] Kimble signed using her date of birth.  Gov. Ex. 9j at 16; Tr. 352:22-24.

115. Kimble claimed $1,707 in mortgage insurance premiums, when she had paid none.  Gov. Ex. 9j, Schedule A; Gov. Ex. 8b; Tr. 355:22, 356:4-9.

116. The false deductions generated $28,555 in itemized deductions,[24] which inflated her refund by $959.  Gov. Ex. 9j, line 40; Gov. Ex. 9p; Tr. 350:11-351:25.

117. On January 26, 2009, Kimble electronically signed[25] under penalty of perjury and filed her 2008 federal tax return. Gov. Ex. 9k at 3, 11; Tr. 357:2-10.

118. The paid preparer section of the tax return had not been completed, indicating that the return had been self-prepared, and Kimble checked "no" when asked if she wanted to authorize a third party to discuss the return with the IRS.  Gov. Ex. 9k.

119. Kimble claimed $5,212 in real estate taxes and $36,524 in home mortgage interest, when she had paid $2,639 and $15,402, respectively.  Gov. Ex. 9k, Schedule A; Gov. Ex. 9u; Gov. Ex. 8b; Tr. 359:24-361:5.

---

[24] The correct amount was zero.  Gov. Ex. 8b at 5.

[25] Kimble signed using her date of birth.  Gov. Ex. 9k at 11; Tr. 357:2-10.

120. Kimble claimed $3,110 in mortgage insurance premiums, when
she had paid none.  Gov. Ex. 9k, Schedule A; Gov. Ex. 9u;
Tr. 361:23-362:10.

121. The false deductions generated $60,572 in itemized
deductions,[26] and increased her refund by $200.  Gov. Ex.
9k, line 40; Gov. Ex. 9p; Tr. 191:3-7, 350:11-17, 362:14-
17.

122. On January 28, 2010, Kimble electronically signed[27] under
penalty of perjury and filed her 2009 federal tax return
from her email account erato24k@hotmail.com.  Gov. Ex. 9l
at 3, 22.[28]

123. The paid preparer section of the tax return had not been
completed, indicating that the return had been self-
prepared.  Gov. Ex. 9l.[29]

124. Kimble claimed $5,388 in real estate taxes and $16,311 in
home mortgage interest, when she had paid $2,381.99 and

---

[26] The correct amount was $20,859.  Gov. Ex. 8b at 11.

[27] Kimble signed using her date of birth.  Gov. Ex. 9l at 22; Tr.
363:1-5.

[28] On February 3, 2010, the IRS received the tax return.  Gov.
Ex. 9s at 7.

[29] Kimble did not respond "yes" or "no" when asked if she wanted
to authorize a third party to discuss the return with the IRS.
Gov. Ex. 9l.

$676.07, respectively.  Gov. Ex. 9l, Schedule A; Gov. Ex. 9v; Gov. Ex. 8b at 20; Tr. 364:10-365:10.

125. Kimble claimed $3,569 in mortgage insurance premiums, when she had paid none.  Gov. Ex. 9l, Schedule A; Gov. Ex. 9v; Gov. Ex. 8b at 20; Tr. 365:22.

126. The false deductions generated $50,391 in itemized deductions,[30] which inflated her refund by $1,966.  Gov. Ex. 9l, line 40; Gov. Ex. 9p; Tr. 366:15.

127. On February 27, 2011, Kimble electronically signed[31] under penalty of perjury and filed her 2010 federal tax return. Gov. Ex. 9m at 24.[32]

128. The paid preparer section of the tax return had not been completed, indicating that the return had been self-prepared, and Kimble checked "no" when asked if she wanted to authorize a third party to discuss the return with the IRS.  Gov. Ex. 9m.

129. On her 2010 Form 1040, Kimble claimed $47,920 in wages. Gov. Ex. 9m, line 7; Tr. 367:17.[33]

---

[30] The correct amount was zero.  Gov. Ex. 8b at 20.

[31] Kimble signed using her date of birth.  Gov. Ex. 9m at 24; Tr. 367:1-9.

[32] On February 3, 2010, the IRS received the tax return.  Gov. Ex. 9s at 7.

130. Kimble did not list $22,174.68 in income that she received
     when she directed other people's refunds into her bank
     accounts, Tr. 370:10-13:

    a. Kimble did not list $1,500 deposited into her ING Bank
     account on March 19, 2010 in connection with Ali
     Abdulai's tax return.  Gov. Ex. 9m at 2; Gov. Ex. 9o;
     Tr. 369:5.

    b. Kimble did not list $7,223 deposited into her ING Bank
     account on March 4, 2010 in connection with Fendlay's
     tax return.  Gov. Ex. 9m at 2; Gov. Ex. 9o; Tr. 369:9.

    c. Kimble did not list $6,170 deposited into her ING Bank
     account on February 12, 2010 in connection with
     Courtland Kimble's tax return.  Gov. Ex. 9m at 2; Gov.
     Ex. 9o; Tr. 369:13.

    d. Kimble did not list $2,152 deposited into her ING Bank
     account on March 19, 2010 in connection with Carrie
     Long's tax return.  Gov. Ex. 9m at 2; Gov. Ex. 9o; Tr.
     369:18.

    e. Kimble did not list $128 deposited into her
     Susquehanna Bank account on September 16, 2010 in

---

[33] The $47,920 consisted of $45,935 in wages from T. Rowe Price
and $1,985 in wages from Ross Stores, Inc.  Gov. Ex. 9m at 6-7;
Tr. 367:16-368:11.

connection with Jackie Pawalski's Massachusetts tax return.  Gov. Ex. 9m at 2; Gov. Ex. 9o; Tr. 369:22.

   f. Kimble did not list $964.53 deposited into her Susquehanna Bank account on September 17, 2010 in connection with Jackie Pawalski's federal tax return. Gov. Ex. 9m; Gov. Ex. 9o; Tr. 370:1.

   g. Kimble did not list $1,555.15 deposited into her ING Bank account on March 5, 2010 in connection with Alexis Thompson's tax return.  Gov. Ex. 9m; Gov. Ex. 9o; Tr. 370:5.

   h. Kimble did not list $2,122 deposited into her ING Bank account on March 5, 2010 in connection with Suleiman Zakaria's tax return.  Gov. Ex. 9m; Gov. Ex. 9o; Tr. 370:9.

131. Kimble falsely claimed a $3,000 American Opportunity Credit.  Gov. Ex. 9m, line 66; Gov. Ex. 8b at 27; Tr. 371:16-19.

132. Kimble claimed $5,537 in real estate taxes, when she had paid $2,452.69.  Gov. Ex. 9m, Schedule A; Gov. Ex. 9w; Gov. Ex. 8b at 29; Tr. 373:1.

133. Kimble claimed $3,580 in mortgage insurance premiums, when she had paid none.  Gov. Ex. 9m, Schedule A; Gov. Ex. 9w; Gov. Ex. 8b at 29; Tr. 373:16-374:2.

134. The false deductions generated $59,928 in itemized
     deductions,[34] which inflated her refund by $3,339.  Gov. Ex.
     9m, line 40; Gov. Ex. 9p; Tr. 374:9.

135. On May 21, 2012, Kimble electronically signed under penalty
     of perjury and filed her 2011 federal tax return.  Gov. Ex.
     9n at 4; Gov. Ex. 9s at 36; Tr. 375:2-6.

136. The paid preparer section of the tax return had not been
     completed, indicating that the return had been self-
     prepared, and Kimble checked "no" when asked if she wanted
     to authorize a third party to discuss the return with the
     IRS.  Gov. Ex. 9n.

137. On her 2011 Form 1040, Kimble claimed $54,568 in wages from
     T. Rowe Price as income.  Gov. Ex. 9n, line 7; Gov. Ex. 9n
     at 36; Tr. 375:19-376:4.

138. Kimble did not claim $41,016.15 in income that she received
     when she directed other people's refunds into her bank
     accounts, Tr. 379:6-8:

         a. Kimble did not list $2,451 deposited into her
            Susquehanna Bank account on February 14th, 2011 in
            connection with Derek Anderson's Maryland tax
            return.  Gov. Ex. 9n at 2; Tr. 376:20.

---

[34] The correct amount was $23,382.  Gov. Ex. 8b at 29.

b. Kimble did not list $4,564 deposited into her ING Bank account on February 24, 2011 in connection with Derek Anderson's federal tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. 376:24.

c. Kimble did not list $5,306 deposited into her ING Bank account on March 7, 2011 in connection with Fendlay's federal tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. 377:3.

d. Kimble did not list $1,047 deposited into her ING Bank account on April 18, 2011 in connection with Christine Gross's federal tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. 377:7.

e. Kimble did not list $88 deposited into her ING Bank account on April 21, 2011 in connection with Gross's Maryland tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9; Tr. 377:8.

f. Kimble did not list $3,457 deposited into her Susquehanna Bank account on March 18, 2011 in connection with Michael Johnson's federal tax return. Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. 377:15.

g. Kimble did not list $4,000 deposited into her Susquehanna Bank account on February 25, 2011 in

connection with Courtland Kimble's federal tax
return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; 377:19.

h. Kimble did not list $4,000 deposited into her ING
   Bank account on April 29, 2011 in connection with
   Kuljich's federal tax return.  Gov. Ex. 9n at 2;
   Gov. Ex. 9o; 377:23.

i. Kimble did not list $1,700 deposited into her
   Susquehanna Bank account on February 25, 2011 in
   connection with Long's federal tax return.  Gov. Ex.
   9n at 2; Gov. Ex. 9o; Tr. 378:2.

j. Kimble did not list $3,000 deposited into her ING
   Bank account on February 25, 2011 in connection with
   Marcus Selvey-Anderson's federal tax return.  Gov.
   Ex. 9n at 2; Gov. Ex. 9o; Tr. 378:6.

k. Kimble did not list $6,000 deposited into her ING
   Bank account on March 25, 2011 in connection with
   Jennifer Meyer's federal tax return.  Gov. Ex. 9n at
   2; Gov. Ex. 9o; Tr. 378:10.

l. Kimble did not list $1,151 deposited into her
   Susquehanna Bank account on April 20, 2011 in
   connection with Thompson's federal tax return.  Gov.
   Ex. 9n at 2; Gov. Ex. 9o; Tr. 378:14.

m. Kimble did not list $1,300 deposited into her ING Bank account on March 11, 2011 in connection with Cheswick's federal tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. 378:18.

n. Kimble did not list $1,333 deposited into her Susquehanna Bank account on March 4, 2011 in connection with Woodland's federal tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. 379:1.

o. Kimble did not list $163 deposited into her ING Bank account on March 4, 2011 in connection with Woodland's Maryland tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. 378:22.

p. Kimble did not list $1,456.15 deposited into her ING Bank account on February 25, 2011 in connection with Zakaria's federal tax return.  Gov. Ex. 9n at 2; Gov. Ex. 9o; Tr. Tr. 379:5.

139. Kimble falsely claimed a $1,836 American Opportunity Credit.  Gov. Ex. 9n, line 66; Gov. Ex. 8b at 35; Tr. 380:1-6.

140. Kimble claimed $3,281 in real estate taxes and $4,006 in home mortgage interest, when she had paid $2,411.09 and $1,759.78, respectively.  Gov. Ex. 9n, Schedule A; Gov. Ex. 9x; Gov. Ex. 8b at 39; Tr. 380:21-381:20.

141. Kimble claimed $3,174 in mortgage insurance premiums, when
     she had paid none.  Gov. Ex. 9n, Schedule A; Gov. Ex. 9x;
     Gov. Ex. 8b at 39; Tr. 382:12-19.

142. The false deductions generated $21,725 in itemized
     deductions,[35] which inflated Kimble's refund by $3,172.
     Gov. Ex. 9n, line 40; Gov. Ex. 9p; Tr. 382:23-25.

Immigration Proceedings

143. On July 22, 2005, Betty Wright married Tamim Mamah[36] in
     exchange for $5,000 and her agreement to assist Mamah with
     his immigration proceedings.  Gov. Ex. 10b; Tr. 202:19-
     204:16, 226:8-9.

144. Mamah paid Wright $500 on the day of the wedding; in
     January 2006, Wright signed an I-130 petition sponsoring
     Mamah's application for permanent resident status.  Gov.
     Ex. 10i; Tr. 207:12-208:16.

145. On September 28, 2006, Wright attended an immigration
     interview with Mamah.  Tr. 226:17-24.

146. Mamah paid Wright an additional $150; she told him that
     unless he paid the agreed-upon $5,000, she would not
     support his immigration application.  Tr. 205:17-206:15.

---

[35] The correct amount was $10,903.  Gov. Ex. 8b at 37.

[36] Mamah is also known as "Abdul Zakaria" and "Abdul Mamah."  Tr.
201:4-22.

147. Mamah never paid Wright more money, and she never saw him again.  Tr. 209:25-210:1.

148. On September 25, 2007, Mamah attended another immigration interview without Wright; Wright's I-130 petition was denied that day, and Mamah was placed into removal proceedings.  Tr. 227:19-228:1.

149. On September 28, 2007, Mamah purportedly filed a complaint for absolute divorce from Wright in the Circuit Court for Baltimore County, which she ostensibly signed on September 12, 2007.  Gov. Ex. 10d; Tr. 228:2-3.

150. On October 3, 2007, "Erica Ross" filed an affidavit of service, swearing that she had personally served the complaint for absolute divorce on Wright.  Gov. Ex. 10e; Tr. 230:22-232:7.

151. On January 3, 2008, Wright purportedly filed an answer to the complaint for absolute divorce, admitting every allegation therein.  Gov. Ex. 10f; Tr. 234:8-235:4.

152. Wright's signature appears twice in the answer: once as "Betty Wright-Mamah," and once as "Betty Mamah-Wright." Gov. Ex. 10f at 4.

153. Kimble stipulated that she drafted the complaint for absolute divorce, affidavit of service, and answer, and

33

that all handwriting on those documents is hers.  Gov. Ex.
12 ¶ 8.

154. On February 22, 2008, Kimble filed an I-130 petition for
     alien relative for Mamah; on March 21, 2008, USCIS received
     the petition.  Gov. Ex. 10n; Tr. 240:10-14, 408:13-17.

155. In the I-130 petition, Kimble certified, under penalty of
     perjury, that Mamah and Wright had divorced in January
     2008, and she and Mamah had married on February 14, 2008.
     Gov. Ex. 10n, lines 8, 12; Tr. 406:8-408:9.

156. Kimble attached to the petition her and Mamah's certificate
     of marriage, an incomplete judgment of absolute divorce
     between Mamah and Wright from the Circuit Court for
     Baltimore County, without a judge's signature and file-date
     stamp,[37] and two completed judgments of absolute divorce
     from her previous marriages.  Gov. Ex. 10a at 65-68; Tr.
     408:22-409:17, 410:8-19.

157. On March 7, 2008, Mamah received a judgment of absolute
     divorce, dissolving his marriage to Wright.  Gov. Ex. 10g;
     Tr. 236:7-16.

158. Statements about marriage and divorce in an I-130 petition
     allow adjudicators to determine whether the qualifying

---

[37] The incomplete judgment had been dated February 5, 2008.  Gov.
Ex. 10a at 66.

relationship that is claimed is legally valid; a
representation that the petitioner had married applicant
while the applicant was married to another person would
result in the application's denial.  Tr. 415:16-416:12.

Search of Kimble's Home

159. On July 28, 2011, Magistrate Judge Stephanie A. Gallagher
     signed a search warrant authorizing the search of Kimble's
     home for "fruits, evidence and instrumentalities of
     marriage fraud, false statement, unlawful procurement of
     citizenship, and perjury, in violation of 8 U.S.C. 1325(c)
     and 18 U.S.C. 1001, 1425, 1621, 1623, listed on Attachment
     B."  Gov. Ex. 13 at 1.[38]

160. Attachment B, titled "Items to be Seized from 23 Rachel
     Court, Owings Mills, MD 21117," permitted officers to seize
     "[a]ny and all records and documents relating to the travel
     of Karen Mamah aka Karen Kimble to Ghana in 2006, including

---

[38] The affidavit supporting the warrant stated that Kimble had
testified at Mamah's brother's trial on drug-related charges
that, in 2006, she had visited Mamah's parents in Ghana.  Gov.
Ex. 13 at 11-12.  Upon review of Kimble's travel records, the
government concluded that Kimble had not traveled to Ghana, and
had perjured herself.  *Id.* at 14.  Kimble was charged with, and
pled guilty to, perjury.  *See United States v. Karen Mamah*,
Crim. Case No. BEL-11-0593 (D. Md. 2011).

but not limited to," 11 enumerated documents.  *Id.*,

Attachment B.[39]

161. On July 29, 2011, officers executed the search warrant.

   Tr. 243:4-5.

162. Before the search began, an agent asked Kimble if she had

   any valuables or weapons in the house; Kimble said she had

   no weapons, but she had some money in her laundry basket.

   Tr. 255:16-22.[40]

163. The agents seized $41,320 in U.S. Currency,[41] contained in a

   bag in the laundry basket, and two boxes of documents.  Tr.

   255:24-256:9; Gov. Ex. 13 at 2.

---

[39] Item number eight permitted the seizure of "[a]ny and all documents . . . that reference or indicate the fraudulent activity."  Gov. Ex. 13, Attachment B.  Item numbers nine to ten authorized the seizure of, among other things, banking documents, financial records, ATM and credit cards, wire transfers, money orders, money wrappers, and cash.  *Id.*

[40] Kimble told agents that the money did not belong to her and she did not know whose it was; about a week before the search, Mamah told her to meet his friend in a parking lot to collect the money and keep it for him.  Tr. 255:24-256:4.

[41] Agents believed the money represented drug proceeds because Mamah was in prison awaiting trial on drug offenses.  *Id.* at 256:7-9.  On May 16, 2011, Mamah was arrested by Drug Enforcement Administration agents and charged with, among other things, conspiracy to distribute and possession with intent to distribute one kilogram or more of heroin.  Gov. Ex. 13 at 10; *see also United States v. Abdul Zakaria*, Crim. Case No. WDQ-11-0371 (D. Md. 2012).

164. During the search, three agents "interviewed [Kimble] on
     several subjects," including "a perjury charge . . . her
     travel, her trip to Ghana[, . . . ] her marriage to [Mamah]
     and her knowledge of other possible fraudulent marriages."
     Tr. 243:4-9, 255:15-16.

165. When agents told Kimble that she had married Mamah before
     he had divorced Wright, Kimble wrote a letter revoking her
     sponsorship of her husband's petition for permanent
     residency.  Tr. 244:1-18; Gov. Trial Ex. 10o.

166. A few months later, Kimble filed a claim for the seized
     $41,320, stating that the money belonged to her as part of
     insurance proceeds received after a house fire.  Tr.
     256:10-12.

167. When agents obtained Kimble's bank accounts to "follow the
     money" she had received from her insurance agent, they
     noticed multiple IRS refunds paid into Kimble's bank
     account.  Tr. 256:12-16.

168. On January 24, 2013, a federal grand jury indicted Kimble
     in the instant case.  ECF No. 1.

II.   Conclusions of Law

    A.   Pretrial Motions[42]

        1.   Motion to Suppress Tangible Evidence

Kimble contends that the money and documents seized during

the search of her residence, and fruits thereof, should be

suppressed because officers exceeded the scope of the search

warrant, which--according to the first sentence of Attachment B-

-had been limited to evidence related to Kimble's travel to

---

[42] Several motions were resolved by the parties immediately
before trial:

On May 1, 2013, Kimble moved for a bill of particulars.  ECF No.
18.  The parties agreed that the motion was moot, *see* ECF Nos.
75 at 21, 87 at 1; it will be denied as such.

On August 1, 2013, the government moved, unopposed, to compel
Kimble to submit handwriting exemplars.  ECF No. 46.  Kimble
later stipulated that handwriting on certain documents
introduced at trial was hers.  ECF No. 75-2.  The government's
motion will be denied as moot.

On August 11, 2014 the government moved *in limine* to admit
evidence of Kimble's perjury conviction.  ECF No. 74.  The
parties agreed that (1) the government would not seek to
introduce the conviction during its case-in-chief, and (2)
Kimble would not oppose the government's use of the conviction
and its underlying facts during cross-examination if Kimble
testified.  ECF Nos. 75 at 21-22; 87 at 1.  Kimble did not
testify.  Tr. 115:22-115:2.  The motion *in limine* will be denied
as moot.

Because the Court will address the merits of Kimble's motion to
dismiss counts 17-20, filed two months after the May 1, 2013
deadline, but will deny as untimely her motion to suppress
statements, made for the first time in post-trial briefing, the
Court will grant in part and deny in part her motion for leave
to file additional motions, ECF No. 17.

Ghana.  ECF No. 16 ¶¶ 8-11.  Kimble further argues that officers could not have had a good faith belief that the warrant authorized seizure of the money.  ECF No. 87 at 2.[43]

The government contends that the clause limiting the search to items related to travel to Ghana was "clearly a typographical error," all evidence seized was within the scope of Attachment B, and Kimble's reliance "on a hyper-technical drafting error . . . would improperly preclude the application of Attachment B's 11 [enumerated documents] to the other violations for which the warrant was issued."  ECF No. 42 at 3-5.  The government further contends that, even if the warrant was invalid, officers relied on it in good faith, and they may properly seize incriminating evidence in plain view during the execution of the search warrant.  *Id.*; *see also* ECF No. 84 at 5-6.[44]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "This fundamental right is preserved by a requirement that

---

[43] Kimble does not contend that the good faith exception is inapplicable to the two boxes of seized documents.  ECF No. 87 at 2.

[44] Post-trial, the government argued that because Kimble had disclaimed ownership of the money seized during the search, she lacked standing to challenge its seizure notwithstanding her later attempt to assert ownership of the money.  ECF No. 84 at 7.  Because the Court will resolve the motion on its merits, it declines to address the government's standing argument.

searches be conducted pursuant to a warrant issued by an independent judicial officer." *United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001) (*quoting California v. Carney*, 471 U.S. 386, 390 (1985)). "[T]o avoid 'a general, exploratory rummaging in a person's belongings,'" a valid search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." *Id.* (*quoting Andresen v. Maryland*, 427 U.S. 463, 480 (1976); U.S. Const. amend. IV). Officers may not "grossly exceed the scope of a search warrant in seizing property." *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) (*quoting United States v. Foster*, 100 F.3d 846, 849-50 (10th Cir. 1996)).

"Blanket suppression" of evidence may be appropriate when "officers flagrantly disregard the terms of the warrant" or "engage in a fishing expedition for the discovery of incriminating evidence." *Id.* at 706. (internal quotation marks and citations omitted). However, blanket suppression is an "extraordinary remedy that should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." *Id.* (*quoting Robinson*, 275 F.3d at 381).

"[A] defective qualifying phrase will not defeat a warrant which is otherwise sufficiently specific." *United States v.*

40

*Jacob*, 657 F.2d 49, 50-52 (4th Cir. 1981) (reversing District Court's suppression of evidence because search warrant, which permitted the seizure of evidence related to "violations of federal criminal law including *but not limited to* mail fraud," was not impermissibly general)(emphasis added).  The Fourth Circuit "seeks to avoid the suppression of evidence seized pursuant to a warrant because of 'hypertechnical' errors."  *Id*. at 52.

Here, the first page of the search warrant authorized the seizure of items related to "marriage fraud, false statement, unlawful procurement of citizenship, and perjury . . . listed on Attachment B."  Gov. Ex. 13 at 1.  Attachment B listed various records and documents, including those indicative of "fraudulent activity," banking and financial records, and cash.  *Id*., Attachment B.  It is clear that the warrant had been intended to cover more than evidence of perjury, and was sufficiently particular.  *See Robinson*, 275 F.3d at 380.  The first sentence of Attachment B ostensibly limiting the search to items relating to Kimble's 2006 travel to Ghana, and, thus, to perjury, is the type of "defective qualifying phrase" that will not defeat an "otherwise sufficiently specific" warrant, *see Jacob*, 657 F.2d at 50.

Even had the warrant's scope not extended beyond documents related to Kimble's travel to Ghana, blanket suppression would be inappropriate.  The *Leon* good-faith exception applies when "the officers reasonably relied on a warrant issued by a detached and neutral magistrate."  *United States v. Gary*, 528 F.3d 324, 329 (4th Cir. 2008) (applying *United States v. Leon*, 468 U.S. 897, 913 (1984) to admit evidence obtained under a warrant containing an "easily-overlooked typographical error").[45] Under *Leon*, evidence will be suppressed only if (1) the issuing judge was misled by information that the affiant knew or should have known was false, (2) the judge "wholly abandoned" his or her neutral role, (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is so facially deficient that no reasonable officer could presume it to be valid.  *Id*. at 923.

None of the *Leon* exceptions applies here.  A warrant is facially valid, if "[it] was based on probable cause and supported by a sworn affidavit, and it described particularly the place of the search" and the items to be seized.  *See Groh*

---

[45] *See also United States v. Angle*, 230 F.3d 113, 117-18 (4th Cir. 2000) *vacated on other grounds*, 254 F.3d 514 (4th Cir. 2001) (en banc) (affirming admission under *Leon* of evidence obtained pursuant to a warrant that erroneously named the wrong trailer to be searched).

*v. Ramirez*, 540 U.S. 551, 557, 124 S. Ct. 1284, 1289, 157 L. Ed. 2d 1068 (2004). The warrant in this case met those requirements. *See* Gov. Ex 13. The affidavit--sworn by Agent Bupp--described at length the factual basis for his belief that Kimble had engaged in immigration- and marriage-related fraud and had perjured herself during Mamah's brother's drug trial. The affidavit further states that Kimble's home had been listed on immigration documents as the home she shared with Mamah, even though an ICE[46] agent had discovered Mamah apparently living at a different address. Gov. Ex. 13 at 6-7. The affidavit establishes a nexus between Kimble and the offenses listed on the search warrant, and a nexus between the offenses and Kimble's home. Thus, the warrant is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" under *Leon*, 468 U.S. at 923. Further, there is no evidence that Judge Gallagher had been misled by false information or had "abandoned" her neutral role. Accordingly, Kimble is not entitled to suppression under *Leon*.

Additionally, items in plain view may properly be seized, provided that officers were "lawfully present at the place from which the evidence can be plainly viewed," had "a lawful right of access to the object itself," and the object's "incriminating

---

[46] "Immigration and Customs Enforcement."

character" was "immediately apparent." *Horton v. California*, 496 U.S. 128, 135 (1990)(citations omitted); *United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir. 1996)(citations and internal quotation marks omitted).

Here, agents were lawfully present at Kimble's home pursuant to the search warrant. Gov. Ex. 13. The government contends--and Kimble has not disputed--that the agents' "familiar[ity] with Kimble's method of operation and the people that she was connected to" made the illegality of the seized documents "readily apparent." ECF No. 42 at 7. Further, Kimble provided "lawful right of access" when she showed the agents where she hid the money. Tr. at 255:20-22; *see Horton*, 495 U.S. at 135. Agents believed the money was proceeds from Mamah's drug activities--a reasonable inference given Mamah's recent arrest and detention on heroin charges, his recent directive to Kimble to collect the money from his friend, whom she met in a parking lot, and its concealment in a bag inside a laundry basket. Tr. at 255:23-256:9; *cf. United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010) (the incriminating nature of a bag of money hidden under a bed could reasonably be inferred when defendant--whose home had been searched--was suspected of drug offenses). Thus, the seizure of the cash was also authorized

under the plain-view doctrine.  Kimble's motion to suppress
evidence will be denied.

    2.   Motion to Dismiss Counts

Kimble moves to dismiss counts seventeen to twenty
(aggravated identity theft) on grounds that the underlying
statute, 18 U.S.C. § 1028A, is void for vagueness.  ECF No. 45
at 1.[47]  Kimble asserts that "she did not 'steal' . . .
identification information," but rather, that "individuals
identified in the Indictment willingly gave [her] this
information."  *Id.* at 2.  The government contends that Kimble is
improperly raising her trial defense that "§ 1028A does not
apply to her conduct as a matter of law, or that as a factual
matter, she did not violate § 1028A."  ECF No. 47 at 2, 5.  The
government further contends that § 1028A is not
unconstitutionally vague.  *Id.* at 5-9.

The Fourth Circuit has interpreted § 1028A such that theft
of identifying information is not required for its use to be
"without lawful authority."  *See United States v. Abdelshafi*,
592 F.3d 602, 605 (4th Cir. 2010) (affirming conviction when
defendant fraudulently used Medicaid information he lawfully

---

[47] Kimble now concedes that "the government's statement of the
law concerning the meaning of 'without lawful authority' under
18 U.S.C. § 1028A(a)(1)" is correct, and "the Court should
conclude that [she] acted without lawful authority."  ECF No. 87
at 8.  The concession does not resolve the vagueness challenge.

possessed through his contract to provide medical transportation

for Medicaid patients).[48]   Thus, provided that the statute is not

constitutionally void, as a matter of law, the government is not

barred from pursuing aggravated identity charges when the

identifying information was not stolen.

Kimble has mounted facial and as-applied challenges to

§ 1028A.  *See* ECF No. 45.  However, when, as here, the criminal

statute does not implicate First Amendment rights, facial

challenges are not permitted.  *See, e.g.*, *United States v.*

*Klecker*, 348 F.3d 69, 71 (4th Cir. 2003) ("Facial vagueness

challenges to criminal statutes are allowed only when the

statute implicates First Amendment rights.").  Accordingly, the

Court will only address Kimble's "as-applied" challenge.

"A fundamental principle in our legal system is that laws

which regulate persons or entities must give fair notice of

conduct that is forbidden or required."  *FCC v. Fox Television*

*Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  The "void-for-

vagueness" doctrine, which stems from the right to procedural

due process, "requires that a penal statute define the criminal

offense with sufficient definiteness that ordinary people can

---

[48] *Accord United States v. Lumbard*, 706 F.3d 716 (6th Cir. 2013);
*United States v. Ozuna-Cabrera*, 663 F.3d 496 (1st Cir. 2011);
*United States v. Retana*, 641 F.3d 272 (8th Cir. 2011);*United
States v. Hurtado*, 508 F.3d 603, 606-07 (11th Cir. 2007),
*abrogated in part on other grounds by Flores-Figueroa v. United
States*, 129 S. Ct. 1886 (2009).

understand what conduct is prohibited and in a manner that does

not encourage arbitrary and discriminatory enforcement." *United

States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (*quoting

Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

          a.    Notice

    Kimble contends that § 1028A failed to provide adequate

notice because "identity theft" is commonly understood "to

penalize the 'theft' or 'stealing of information,'" an

understanding that is reflected in the statute's title--

"Aggravated Identity Theft." ECF No. 45 at 5-7. Thus, Kimble

contends, she lacked notice that filing a fraudulent tax return

using information provided by, *i.e.*, not stolen from,

individuals, exposed her to this charge. *Id.* at 7. The

government contends that § 1028A's plain language, in

conjunction with its scienter requirement, provided Kimble with

fair notice. ECF No. 47 at 7-8.

    Kimble relies on *United States v. Villanueva-Sotelo*, 515

F.3d 1234, 1243 (D.C. Cir. 2008) to support her argument that

the statute contemplates theft. ECF No. 45 at 6-7. There, the

D.C. Circuit addressed whether a defendant convicted of

violating § 1028A must know that the identifying information

belonged to someone else. *See Villanueva-Sotelo*, 515 F.3d at

1242-43.[49]  Thus, it is inapposite as there is no suggestion (or
evidence) that Kimble had been unaware that any identifying
information did not belong to her.  The U.S. Supreme Court has
repeatedly stated, however, that "[a] statute's caption . . .
cannot undo or limit its text's plain meaning."  *Intel Corp. v.*
*Advanced Micro Devices, Inc.*, 542 U.S. 241, 242 (2004) (*citing*
*Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947).
When, as here, a statute's text permits a broader application
than its caption indicates, the statute's reach is judged by its
text.  *See id.*; *see also Match-E-Be-Nash-She-Wish Band of*
*Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2216 n.5
(2012).  Accordingly, that § 1028A is captioned "Aggravated
Identity Theft" when its text reaches unlawful use of
information that was not stolen does not mean that § 1028A is
impermissibly vague.  As the Fourth Circuit has observed, "[i]f
Congress intended to provide for an enhanced penalty only when
an identification was stolen by a defendant . . ., it easily
could have used the words "stolen" or "theft" in [the text of]
§ 1028A(a)(1)."  *Abdelshafi*, 592 F.3d at 608 (*citing Hurtado*,
508 F.3d at 608).

---

[49] The U.S. Supreme Court has since resolved that issue, holding
that aggravated identify theft requires the government to prove
"that the defendant knew that the means of identification at
issue belonged to another person."  *Flores-Figueroa v. United*
*States*, 556 U.S. 646, 657 (2009).

48

Kimble further asserts that § 1028A's legislative history shows that "Congress intended to criminalize . . . the 'theft' of a victim's identification." ECF No. 45 at 5. However, "legislative history" is not "determinative if the plain language of the statute unambiguously indicate[s]" what Congress sought to proscribe. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007).

Here, the plain language of § 1028A proscribes knowingly using another's identity without lawful authority; it plainly does not require the identity to have been stolen. Section 1028--which precedes § 1028A and governs identity fraud-- enumerates two instances, in a list of eight, when an "identification document [must] be 'stolen or produced without lawful authority,'" suggesting that Congress will include a misappropriation element when it wants to. *Abdelshafi*, 592 F.3d at 607-608 (*quoting* 18 U.S.C. § 1028). Thus, § 1028A "plainly indicates that Congress intended to prohibit a wider range of activities in § 1028A(a)(1) than just theft." *Id.* at 608.[50]

Additionally, a statute's "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Estates v. Flipside, Hoffman*

---

[50] *See also Castro*, No. 07-5065-01-CR-SW-RED, 2008 WL 3925172, at *4-5.

*Estates, Inc.*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1193, 71 L.
Ed. 2d 362 (1982).  Section 1028A's "knowing" requirement
applies to the "use" of the identifying information, and that it
belonged to another.  *See Flores-Figueroa*, 556 U.S. at 647.
Accordingly, Kimble had fair notice that her conduct ran afoul
of the law.

    b. Arbitrary Enforcement

  Kimble contends that § 1028A's phrase "without lawful
authority" impermissibly fails to "narrow the scope of [the
statute's] prohibition and limit prosecutorial discretion."  ECF
No. 45 at 8 (*quoting Gonzales v. Carhart*, 550 U.S. 124, 150
(2007).  According to Kimble, the government seeks "to expand
application of 18 U.S.C. § 1028A" to situations where "identity
holders gave a defendant permission to use their" identifying
information; thus, Kimble argues, this "broad application . . .
paves the way for arbitrary and discriminatory application."
*Id*. at 8-9.[51]  The government contends that "§ 1028A was not
arbitrarily enforced against [Kimble]" because the scienter
requirement limited the government's discretion, and the

_____

[51] Kimble's additional argument--that the government may charge
"virtually any person acting as an agent for another, who
commits fraud, with Aggravated Identity Theft,"--is merely
another version of her argument--since conceded--that § 1028A
requires the means of identification to have been stolen.  ECF
No. 45 at 8-9.

government has alleged that Kimble acted knowingly.  ECF No. 47 at 8-9.

Kimble relies on *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), where the U.S. Supreme Court struck down an ordinance that proscribed "annoying" conduct because it was imprecise and left too much discretion to officers.  In contrast, here, "without lawful authority" sets an objective line, separating persons who lawfully "transfer[], possess[], or use[]" identities from those who do so unlawfully.  The government hewed to that line when it charged Kimble with unlawfully using the identifying information provided by her clients.

Similar to the notice requirement discussed above, an "intent requirement alone tends to defeat any vagueness challenge based on the potential for arbitrary enforcement." *United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003) (*citing United States v. Carlson*, 87 F.3d 440, 444 (11th Cir. 1996)).  Accordingly, § 1028A is not unconstitutionally vague under the arbitrary enforcement prong; Kimble's motion to dismiss counts seventeen to twenty will be denied.

  B. Post-trial Motion to Suppress Statement

Kimble moves, post-trial, to suppress the statement Kimble made to agents during the July 29, 2011 search of her home, and

evidence derived thereof.  ECF No. 87 at 2.  Kimble asserts that

she did not receive *Miranda* warnings and her statement was

involuntary.  *Id.* at 3-7.  The government contends that Kimble's

motion is untimely, and, thus, that it lacked the opportunity to

present evidence on the motion at trial.  ECF No. 89 at 2-5.

Under Federal Rule of Criminal Procedure 12(b)(3)(C),

motions to suppress *must* be made before trial "if the basis for

the motion is then reasonably available and the motion can be

determined without a trial on the merits."[52]  "If a party does

not meet the deadline for making a Rule 12(b)(3) motion, the

motion is untimely."  Fed. R. Crim. P. 12(c)(3).  However, "a

court may consider the defense, objection, or request if the

party shows good cause."  *Id.*; *see also United States v. Wilson*,

895 F.2d 168, 173 (4th Cir. 1990)(affirming denial of motion for

hearing on statement's voluntariness made on the morning of

trial); *United States v. Badwan*, 624 F.2d 1228, 1232 (4th Cir.

1980)(affirming denial of motion to suppress statement made on

the morning of trial because "nine days from arraignment to the

---

[52] The Court initially set May 1, 2013 as the pretrial motions
deadline when it granted the parties' consent motion to
reschedule trial to July 2013.  ECF No. 14.  After several
postponements requested by counsel, *see* ECF Nos. 15, 32, 57, on
June 11, 2014, the Court ordered the parties to submit a
proposed motions briefing schedule by June 25, 2014, ECF No. 71.
There is no record evidence that the parties submitted the
motions schedule.

time for submission of pre-trial motions was sufficient for
preparation of the motion").

Kimble's motion is woefully late.[53]  Although the record is
unclear about when Kimble's counsel first learned of possible
grounds for suppressing her statement, it strains credulity that
he first learned of the statement when Agent Bupp testified at
trial,[54] particularly when a motion to suppress the evidence
seized on that same date, and which had been discovered in part
on the basis of Kimble's statement, had been filed in May 2013,
almost 20 months before trial began. *See* ECF No. 16.  Since
Kimble's current counsel was appointed in August 2013, several
status conferences and a hearing on Kimble's waiver of her right
to jury trial have been held.  *See* ECF Nos. 55, 72.  Thus, the
Court provided Kimble ample opportunity to raise the motion.
Even an oral motion to suppress made at trial in response to
Agent Bupp's testimony about Kimble's statement[55]--though still
untimely[56]--would have provided the Court the opportunity to

---

[53] Kimble concedes that the motion is late and may not have been
preserved for argument.  ECF No. 87 at 2.

[54] Nor has Kimble asserted that to be the case.  *See* ECF No. 87
at 2-7.

[55] A written record of Kimble's statement was not admitted.

[56] *See, e.g.*, *United States v. Bin Laden*, 132 F. Supp. 2d 198,
213 (S.D.N.Y. 2001) *aff'd sub nom. In re Terrorist Bombings of*

decide whether it wished to receive the evidence it *needs* to

decide the untimely motion.[57]   In any event, Kimble has offered

the Court no reason for her failure to raise the motion until

now.   Accordingly, it will be denied.   *See Wilson*, 895 F.2d at

173 ("The district court should grant relief *only if* there is a

showing of cause for the noncompliance and a showing of

resulting prejudice.")(emphasis added).

    C.   Counts One to Six:  Wire Fraud (18 U.S.C. § 1343)

    Under 18 U.S.C. § 1343,

> Whoever, having devised or intending to devise any
> scheme or artifice to defraud, or for obtaining money
> or property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to
> be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any
> writings, signs, signals, pictures, or sounds for the
> purpose of executing such scheme or artifice, shall be
> [guilty of a crime].

The elements of wire fraud are (1) a scheme to defraud or obtain

money or property by materially[58] false or fraudulent pretenses,

---

*U.S. Embassies in E. Africa*, 552 F.3d 177 (2d Cir. 2008) (before
trial means before jury selection).

[57] *See United States v. Long*, 803 F. Supp. 1086, 1089 (D.S.C.
1992)("Rule 12(b)(3) requires the parties to make motions to
suppress prior to trial because it 'gives the court notice that
evidence has been illegally obtained so that it will not be
compelled to stop the trial to consider the issue.'")(*quoting*
Charles A. Wright, Federal Practice and Procedure, § 673, at
766-67 (1982)).

[58] "In general, a false statement is material if it has a natural
tendency to influence, or [is] capable of influencing, the

representations, or promises, and (2) a wire communication in furtherance of the scheme. *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012).

To establish a scheme to defraud, the government must prove that Kimble acted with the specific intent to defraud; that is, to deprive the victims--here, the IRS and the State of Maryland--of something of value. *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012). "[T]he specific intent to defraud . . . may be inferred from the totality of the circumstances and need not be proven by direct evidence." *United States v. Harvey*, 532 F.3d 326, 334 (4th Cir. 2008) (internal quotation marks and citations omitted).

      1.    Count One

          a.    Scheme to Defraud

The government proved beyond a reasonable doubt that Kimble devised a scheme to obtain money from the IRS by materially false and fraudulent representations on Fendlay's 2009 Form 1040, and that Kimble acted with the specific intent to defraud the IRS. Although Fendlay gave Kimble her tax preparation

---

decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16, 119 S. Ct. 1827, 1837, 144 L. Ed. 2d 35 (1999) (internal quotation marks and citation omitted); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1122 (D.C. Cir. 2009) ("[The] materiality requirement is met if the matter at issue is of importance to a reasonable person in making a decision about a particular matter or transaction.") (internal quotation marks and citation omitted).

documents, Kimble materially misrepresented $30,399 in false itemized deductions, which generated an inflated refund of $7,223 and, thus, deprived the IRS of $6,102.  Gov. Ex. 4e, line 73a, Schedule A; Gov Ex. 8d at 6; Gov. Ex. 9q; Tr. 81:7-10, 109:9, 186:18-24, 338:8-339:25.  Kimble directed the refund into her bank account without Fendlay's permission.  Gov. Ex. 4e, lines 73d; Tr. 109:21.  Fendlay received just $2,485 from her federal and state tax refunds; Kimble kept the remainder.  Tr. 105:11-13.  Kimble's preparation of two different tax returns-- one for Fendlay and one for the IRS--disguising the fraudulent entries and obfuscating her role as the paid preparer, further proves her specific intent to defraud.  Gov. Ex. 4b; Gov. Ex. 4e; Tr. 111:5-12, 16-24.  Additionally, when the IRS contacted Fendlay to discuss problems with her 2009 tax return, Kimble misled Fendlay and Cheswick--Fendlay's former granddaughter-in- law--about the cause of the problems and promised to take care of it; she never did.  Gov. Ex. 3l; Gov. Ex. 3n; Gov. Ex. 12 ¶ 3; Tr. 90:16-17, 120:21-25.  Accordingly, the government has proved beyond a reasonable doubt that Kimble devised a scheme to defraud the IRS.

          b.    Use of the Wires

The government proved beyond a reasonable doubt that Kimble used a wire communication in furtherance of the above-described

scheme.   Kimble stipulated that Fendlay's 2009 Form 1040
traveled electronically in interstate commerce.   Gov. Ex. 12 ¶
6.   Additional evidence shows that--on February 18, 2010--Kimble
submitted Fendlay's 2009 Form 1040 using her email account
erato24k@hotmail.com; the tax return travelled by wire in
interstate commerce, beginning in Maryland, travelling to
California, and then to the IRS in Massachusetts.   Gov. Ex. 9r;
Tr. 324:1, 348:14-15, 350:3-5.   Accordingly, the Court will find
Kimble guilty on count one.

> 2.   Count Two

> > a.   Scheme to Defraud

The government proved beyond a reasonable doubt that Kimble
devised a scheme to obtain money from the IRS by materially
false and fraudulent representations on Thompson's 2009 Form
1040, and that Kimble acted with the specific intent to defraud
the IRS.   Although Thompson gave Kimble her tax preparation
documents, Kimble materially misrepresented $16,229 in false
itemized deductions, which generated an inflated refund of
$1,653.   Gov. Ex. 6h, lines 40a, 72, Schedule A; Tr. 151:3-12,
153:14-25, 157:4-7, 168:11-19.   Because Thompson owed $1,482 in
federal taxes, Kimble's misrepresentation deprived the IRS of
$3,135.   Gov. Ex. 9q.   Kimble directed the refund into her bank
account and gave Thompson just $136 in cash.   Tr. 157:11.

Kimble's preparation of two different tax returns--one for Thompson and one for the IRS--disguising the fraudulent entries and obfuscating her role as the paid preparer, further proves her specific intent to defraud.  Gov. Ex. 6h, line 74a; Gov. Ex. 6g; Tr. 117:8-24.  Accordingly, the government has proved beyond a reasonable doubt that Kimble devised a scheme to defraud the IRS.

b.   Use of the Wires

The government proved beyond a reasonable doubt that Kimble used a wire communication in furtherance of the above-described scheme.  Kimble stipulated that Thompson's 2009 Form 1040 traveled electronically in interstate commerce.  Gov. Ex. 12 ¶ 6.  Additionally, the evidence shows that--on February 24, 2010--Kimble submitted Thompson's 2009 Form 1040 using her email account erato24k@yahoo.com; the tax return travelled by wire in interstate commerce, beginning in Maryland, travelling to California, and then to the IRS in Massachusetts.  Gov. Ex. 9s at 11; Gov. Ex. 9r; Tr. 324:1, 348:14-15, 350:3-5.  Accordingly, the Court will find Kimble guilty on count two.

3.   Count Three

a.   Scheme to Defraud

The government proved beyond a reasonable doubt that Kimble devised a scheme to obtain money from the IRS by materially

58

false and fraudulent representations on Woodland's 2010 Form
1040, and that Kimble acted with the specific intent to defraud
the IRS.  Woodland never received his W-2 sent to Kimble's
address and did not authorize Kimble to file his taxes; yet,
Kimble used his W-2 and personal information to prepare and
electronically sign and file Woodland's 2010 federal tax return.
Gov. Ex. 7a; Gov. Ex. 9s at 29; Gov. Ex. 12 ¶ 6; Tr. 172:10-12,
173:21-174:14, 176:25, 349:18-21.  Kimble overstated the
applicable deductions by $950 and claimed a false $340 student
loan interest deduction and $1,000 American Opportunity credit.
Gov. Ex. 7a, lines 33, 40; Gov. Ex. 8l at 1; Tr. 393:18-394:16.
Kimble's material misrepresentations generated a refund of
$1,333 to which Woodland was not entitled; thus, Kimble deprived
the IRS of that $1,333.  Gov. Ex. 7a, line 74a; Gov. Ex. 8l;
Gov. Ex. 9q; Tr. 180:8-10, 340:20-341:1.  Kimble directed the
refund into her bank account without Woodland's permission;
Woodland never received it.  Gov. Ex. 7a, line 74d; Gov. Ex. 9o;
Gov. Ex. 12 ¶ 7; Tr. 173:14.

Additionally, the government proved beyond a reasonable
doubt that Kimble devised a scheme to obtain money from the
State of Maryland by materially false and fraudulent
representations on Woodland's 2010 Maryland tax return, and that
Kimble acted with the specific intent to defraud the State of

59

Maryland.  In or about February 2010, Kimble electronically

filed Woodland's ostensibly "self-prepared" tax return bearing

Woodland's purported signature and telephone number, without

Woodland's permission.  Gov. Ex. 7c; Gov. Ex. 12 ¶ 6; Tr.

174:21-24.  Woodland had not prepared or signed the tax return

and the telephone number belonged to Kimble.  Gov. Ex. 4d; Tr.

105:5-10, 174:19-21, 175:18.  Kimble's material

misrepresentation that the tax return had been self-prepared and

signed by Woodland caused the State of Maryland to issue a

refund of $163, which Kimble had directed into her bank account;

Woodland never received the money.  Gov. Ex. 7c, lines 21, 24c;

Tr. 175:15.  Accordingly, the government has proved beyond a

reasonable doubt that Kimble devised a scheme to defraud the IRS

and the State of Maryland.

b.   Use of the Wires

The government has proved beyond a reasonable doubt that

Kimble used a wire communication in furtherance of the above-

described scheme.  Kimble stipulated that Woodland's 2010 Form

1040 and Maryland tax return traveled electronically in

interstate commerce.  Gov. Ex. 12 ¶ 6.  Additionally, the

evidence shows that--on February 19, 2011--Kimble submitted

Woodland's 2010 Form 1040 using her email account

erato24k@hotmail.com; the tax return travelled by wire in

60

interstate commerce, beginning in Maryland, travelling to
California, and then to the IRS in Massachusetts.  Gov. Ex. 9s
at 29; Gov. Ex. 9r; Tr. 324:1, 348:14-15, 349:18-21, 350:3-5.
Accordingly, the Court will find Kimble guilty on count three.

        4.   Count Four

        a.   Scheme to Defraud

The government proved beyond a reasonable doubt that Kimble
devised a scheme to obtain money from the IRS by materially
false and fraudulent representations on Fendlay's 2010 Form
1040, and that Kimble acted with the specific intent to defraud
the IRS.  Although Fendlay gave Kimble her tax preparation
documents, Kimble materially misrepresented $19,953 in false
itemized deductions, which generated an inflated refund of
$5,306 and, thus, deprived the IRS of $2,723.  Gov. Ex. 4m, line
40a, Schedule A; Gov. Ex. 9q; Tr. 114:9-115:8, 341:2-344:2.
Kimble directed the refund into her bank account without
Fendlay's permission; Fendlay never received that money.  Gov.
Ex. 4m, line 74d; Tr. 115:13-17.  Kimble's preparation of two
different tax returns--one for Fendlay and one for the IRS--
disguising the fraudulent entries and obfuscating her role as
the paid preparer, further proves her specific intent to
defraud.  Gov. Ex. 4i, Gov. Ex. 4m; line 74a; Tr. 117:8-24.

Accordingly, the government has proved beyond a reasonable doubt that Kimble devised a scheme to defraud the IRS.[59]

> b.   Use of the Wires

The government proved beyond a reasonable doubt that Kimble used a wire communication in furtherance of the above-described scheme.   Kimble stipulated that Fendlay's 2010 Form 1040 traveled electronically in interstate commerce.   Gov. Ex. 12 ¶ 6.   Additionally, the evidence shows that--on February 27, 2011-

---

[59] The government has *not* proved beyond a reasonable doubt that Kimble devised a scheme to defraud the State of Maryland. Although one need not succeed in the scheme to defraud to be convicted of wire fraud, the government must prove that Kimble intended to "lie or cheat or misrepresent" for the purpose of obtaining money or property from the State of Maryland, *Wynn*, 684 F.3d at 478; *United States v. Bunn*, 26 F. App'x 139, 142 (4th Cir. 2001); *United States v. St. Gelais*, 952 F.2d 90, 96 (5th Cir. 1992)("To act with intent to defraud means to act knowingly and with the specific intent to deceive, ordinarily for the purpose of *causing some financial loss* to another or *bringing about some financial gain to one's self.*")(emphasis added).   Here, although the false federal itemized deductions carried over to Fendlay's 2010 Maryland return, Gov. Ex. 4n, there is no evidence that Kimble received or attempted to receive the corresponding $901 refund; Kimble gave Fendlay a copy of her 2010 Maryland return stating that she was entitled to $901.   Gov. Ex. 4j; Tr. 118:15-119:4.   Further, there is no evidence that the $901 refund was more than it should have been as it appeared that Fendlay was entitled to a refund of the amount of taxes paid; *i.e.*, there is no evidence that Kimble devised a scheme to deprive the State of Maryland of money.   *See Wynn*, 684 F.3d at 478 ("[M]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.") (*quoting United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)).   Nonetheless, as explained above, the government has proved beyond a reasonable doubt that Kimble intended to defraud the IRS; thus, she will be found guilty on this count.

-Kimble submitted Fendlay's 2010 Form 1040 using her email account erato24k@yahoo.com; the tax return travelled by wire in interstate commerce, beginning in Maryland, travelling to California, and then to the IRS in Massachusetts.  Gov. Ex. 9s at 15; Gov. Ex. 9r; Tr. 324:1, 348:14-15, 350:3-5.  Accordingly, the Court will find Kimble guilty on count four.

     5.    Count Five

       a.   Scheme to Defraud

The government proved beyond a reasonable doubt that Kimble devised a scheme to obtain money from the IRS by materially false and fraudulent representations on Thompson's 2010 Form 1040, and that Kimble acted with the specific intent to defraud the IRS.  Although Thompson gave Kimble her tax preparation documents, Kimble materially misrepresented $15,236 in false itemized deductions, which generated an inflated refund of $6,156.  Gov. Ex. 6i; Gov. Ex. 6k, line 40, Schedule A; Tr. 158:10-159:4, 160:22-162:16.  Because Thompson was entitled to a $63 refund for the 2010 tax year, Kimble's misrepresentations deprived the IRS of $6,093.  Gov. Ex. 9q.  Kimble directed the refund into her bank account and gave Thompson $5,153 in cash; Kimble kept the remaining $940.  Gov. Ex. 6k, line 74d; Gov. Ex. 9o; Tr. 157:11, 159:23-160:4.  Kimble's preparation of two different tax returns--one for Thompson and one for the IRS--

disguising the fraudulent entries and obfuscating her role as the paid preparer, further proves her specific intent to defraud.  Gov. Ex. 6j, line 74a; Gov. Ex. 6k; Tr. 159:5-13. Accordingly, the government has proved beyond a reasonable doubt that Kimble devised a scheme to defraud the IRS.

b.   Use of the Wires

The government proved beyond a reasonable doubt that Kimble used a wire communication in furtherance of the above-described scheme.  Kimble stipulated that Thompson's 2010 Form 1040 traveled electronically in interstate commerce.  Gov. Ex. 12 ¶ 6.  Additionally, the evidence shows that--on April 15, 2011-- Kimble electronically filed Thompson's 2010 Form 1040; the tax return travelled by wire in interstate commerce, beginning in Maryland, travelling to California, and then to the IRS in Massachusetts.  Gov. Ex. 6k; Gov. Ex. 9r; Tr. 324:1, 348:14-15, 350:3-5.  Accordingly, the Court will find Kimble guilty on count five.

6.   Count Six

a.   Scheme to Defraud

The government proved beyond a reasonable doubt that Kimble devised a scheme to obtain money from the IRS by materially false and fraudulent representations on Kuljich's 2010 Form 1040, and that Kimble acted with the specific intent to defraud

64

the IRS.  Although Kuljich gave Kimble her tax preparation documents, Kimble materially misrepresented $16,535 in false itemized deductions, and falsely claimed a $1,000 education credit, which generated a refund of $4,389.  Gov. Ex. 5b; Gov Ex. 5d, lines 40a, 66, Schedule A; Tr. 132:3-135:15, 189:15-190:2.  Because Kuljich owed $2,425 in federal taxes, Kimble's misrepresentations deprived the IRS of $6,814.  Gov. Ex. 9q. Kimble directed $4,000 of the refund into her bank account; the remaining $389 went to Zuljich.  Gov. Ex. 5d, Form 8888; Gov. Ex. 5f; Gov. Ex. 9o; Tr. 136:4-15.  Kimble's preparation of two different tax returns--one for Zuljich and one for the IRS-- disguising the fraudulent entries and obfuscating her role as the paid preparer, further proves her specific intent to defraud.  Gov. Ex. 5c; Gov. Ex. 5d; Tr. 128:5-12, 129:5-23.  The government has proved beyond a reasonable doubt that Kimble devised a scheme to defraud the IRS.

> b.   Use of the Wires

The government has proved beyond a reasonable doubt that Kimble used a wire communication in furtherance of the above- described scheme.  Kimble stipulated that Zuljich's 2010 Form 1040 traveled electronically in interstate commerce.  Gov. Ex. 12 ¶ 6.  Additionally, the evidence shows that--on April 15, 2011--Kimble electronically filed Zuljich's 2010 Form 1040 using

Zuljich's date of birth; the tax return travelled by wire in
interstate commerce, beginning in Maryland, travelling to
California, and then to the IRS in Massachusetts.  Gov. Ex. 5d
at 11; Tr. 349:22-350:5.  Accordingly, the Court will find
Kimble guilty on count six.

    D.    Counts Seven to Eleven: Tax Fraud (26 U.S.C.
        § 7206(1))

Section 7206(1) bars willfully making and subscribing a
false document under penalty of perjury.  26 U.S.C. § 7206(1)
(2012).  To establish tax fraud under § 7206(1), the government
must prove that "(1) the defendant made and subscribed to a tax
return containing a written declaration; (2) the tax return was
made under penalties of perjury; (3) the defendant did not
believe the return to be true and correct as to every material
matter; and (4) the defendant acted willfully."  *United States
v. Aramony*, 88 F.3d 1369, 1382 (4th Cir. 1996); *United States v.
Moore*, 498 F. App'x 195, 201 (4th Cir. 2012).

"Under § 7206(1), the test of materiality is whether a
particular item must be reported 'in order that the taxpayer
estimate and compute his tax correctly.'"  *Aramony*, 88 F.3d at
1384 (*quoting United States v. Null*, 415 F.2d 1178, 1181 (4th

Cir. 1969).  "Under 26 U.S.C. § 63,[60] an individual's taxable
income is defined as the individual's gross income minus
allowable deductions, including itemized deductions."  *United
States v. Klausner*, 80 F.3d 55, 60 (2d Cir. 1996); *see also
United States v. Warden*, 545 F.2d 32, 37 (7th Cir. 1976) ("Since
deductions are subtracted from gross income or adjusted gross
income to reduce the ultimate tax liability, they are material
to the contents of the return.").  "[A] finding of materiality
does not depend upon the amount of the unpaid tax."  *Aramony*, 88
F.3d at 1385 (*citing United States v. Hedman,* 630 F.2d 1184,
1196 (7th Cir. 1980) ("false statements relating to gross
income, irrespective of the amount, constitute a material
misstatement in violation of Section 7206(1)")).

"Willfulness . . . means a voluntary, intentional violation
of a known legal duty."  *United States v. Pomponio*, 429 U.S. 10,
12, 97 S. Ct. 22, 24, 50 L. Ed. 2d 12 (1976).  In the context of
tax evasion under 26 U.S.C. § 7201, the Fourth Circuit has held
that willfulness may be inferred "from 'any conduct having the
likely effect of mis-leading or concealing.'"  *United States v.
Secor*, 73 F. App'x 554, 560 (4th Cir. 2003) (*quoting United
States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997)).

---

[60] Section 63 states that "'taxable income' means gross income
minus the deductions allowed by this chapter (other than the
standard deduction)."  26 U.S.C. § 63(a)(2012).

Willfulness may also be inferred from "making false entries of alterations, or . . . concealment of assets or covering up sources of income,"[61] "a pattern of concealment of true income,"[62] or a defendant's act of signing tax returns containing false material matters.[63]

      1.    Count Seven

          a.   Making and Subscribing to a Tax Return Under Penalty of Perjury

The government proved beyond a reasonable doubt that Kimble prepared and--on January 31, 2008--electronically signed and filed her 2007 federal tax return under penalty of perjury. Gov. Ex. 9j at 3, 16; Tr. 352:16-24.  Accordingly, the first two elements are met.

          b.   False as to a Material Matter

The government proved beyond a reasonable doubt that Kimble made several substantially false entries on her 2007 federal tax return: she claimed $3,538 in real estate taxes and $20,003 in home mortgage interest, when she had paid just $1,273.79 and

---

[61] *United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999) (*quoting Spies v. United States*, 317 U.S. 492, 499, 63 S. Ct. 364, (1943)).

[62] *United States v. Callanan*, 450 F.2d 145, 148 (4th Cir. 1971).

[63] *United States v. Boulerice*, 325 F.3d 75, 81 (1st Cir. 2003); *see also United States v. Jiggetts*, 850 F.2d 690, 1988 WL 67602 (4th Cir. 1988)(table opinion)(affirming conviction under § 7206(1) when defendant "was conversant in tax principles" and had no basis for excluding certain income).

$3,375, respectively, and she claimed $1,707 in mortgage insurance premiums, when she had paid none.  Gov. Ex. 9j, Schedule A; Gov. Ex. 9t; Gov. Ex. 8b; Tr. 353:20-355:8, 355:22, 356:4-9.  Because of these false entries, Kimble entered inflated total itemized deductions of $28,555 on line 40 of her 2007 federal tax return.  Gov. Ex. 9j, line 40.  This amount was material because it increased Kimble's refund by $959.  Gov. Ex. 9p.  Further, Kimble knew that the entries--and, thus, the total itemized deductions amount--were false because her mortgage provider had sent her a 2007 Form 1098 with the correct amounts. *See* Gov. Ex. 9t.  Accordingly, the third element is met.

c.   Willfulness

The government proved beyond a reasonable doubt that Kimble acted willfully.  Notwithstanding her improper conduct, Kimble had extensive experience preparing taxes.  Further, Kimble signed a tax return containing several entries improperly inflated by thousands of dollars, causing the IRS to refund $959 more than it should have.  Gov. Ex. 9j.  Accordingly, the fourth element is met.  The Court will find Kimble guilty on count seven.

2.    Count Eight

    a.    Making and Subscribing to a Tax Return Under
        Penalty of Perjury

The government proved beyond a reasonable doubt that Kimble prepared and--on January 26, 2009--electronically signed and filed her 2008 federal tax return under penalty of perjury. Gov. Ex. 9k at 3, 11; Tr. 357:2-10.  Accordingly, the first two elements are met.

    b.    False as to a Material Matter

The government proved beyond a reasonable doubt that Kimble made several substantially false entries on her 2008 federal tax return: she claimed $5,212 in real estate taxes and $36,524 in home mortgage interest, when she had paid $2,639 and $15,402, respectively, and she claimed $3,110 in mortgage insurance premiums, when she had paid none.  Gov. Ex. 9k, Schedule A; Gov. Ex. 9u; Gov. Ex. 8b; Tr. 359:24-361:5, 361:23-362:10.  Because of these false entries, Kimble entered inflated total itemized deductions of $60,572 on line 40 of her 2008 federal tax return. Gov. Ex. 9k, line 40.  This amount was material because it increased Kimble's refund by $200.  Gov. Ex. 9p.  Further, Kimble knew that the entries--and, thus, the total itemized deductions amount--were false because her mortgage provider had sent her a 2008 Form 1098 with the correct amounts.  *See* Gov. Ex. 9u.  Accordingly, the third element is met.

70

c.    Willfulness

The government proved beyond a reasonable doubt that Kimble acted willfully.  As noted above, Kimble had extensive experience preparing taxes, and signed a tax return containing several entries improperly inflated by thousands of dollars, causing the IRS to refund $200 more than it should have.  Gov. Ex. 9k.  Accordingly, the fourth element is met.  Court will find Kimble guilty on count eight.

3.    Count Nine

a.    Making and Subscribing to a Tax Return Under Penalty of Perjury

The government proved beyond a reasonable doubt that Kimble prepared and--on January 28, 2010--electronically signed and filed her 2009 federal tax return under penalty of perjury. Gov. Ex. 9l at 3, 22; Tr. 363:1.[64]  Accordingly, the first two elements are met.

b.    False as to a Material Matter

The government proved beyond a reasonable doubt that Kimble made several substantially false entries on her 2009 federal tax return: she claimed $5,388 in real estate taxes and $16,311 in home mortgage interest, when she had paid $2,381.99 and $676.07, respectively, and she claimed $3,569 in mortgage insurance

---

[64] The IRS received the tax return on February 3, 2010, the date the indictment alleges Kimble filed the return.  Gov. Ex. 9s at 7; ECF No. 1 at 5.

71

premiums, when she had paid none.  Gov. Ex. 91, Schedule A; Gov.
Ex. 9v; Gov. Ex. 8b at 20; Tr. 364:10-365:10, 365:22.  Because
of these false entries, Kimble entered inflated total itemized
deductions of $50,391 on line 40 of her 2009 federal tax return.
Gov. Ex. 91, line 40.  This amount was material because it
increased Kimble's refund by $1,966.  Gov. Ex. 9p.  Further,
Kimble knew that the entries--and, thus, the total itemized
deductions amount--were false because her mortgage provider had
sent her a 2009 Form 1098 with the correct amounts.  *See* Gov.
Ex. 9v.  Accordingly, the third element is met.

> c.   Willfulness

The government proved beyond a reasonable doubt that Kimble
acted willfully.  Kimble had extensive experience preparing
taxes, and signed a tax return containing several entries
improperly inflated by thousands of dollars, causing the IRS to
refund almost $2000 more than it should have.  Gov. Ex. 91.
Additionally, Kimble had a pattern of making false entries in
each year's tax return.  Accordingly, the fourth element is met.
The Court will find Kimble guilty on count nine.

> 4.   Count Ten

> a.   Making and Subscribing to a Tax Return Under
>      Penalty of Perjury

The government proved beyond a reasonable doubt that Kimble
prepared and--on February 27, 2011--electronically signed and

72

filed her 2010 federal tax return under penalty of perjury.
Gov. Ex. 9m at 24, Tr. 367:1-9.  Accordingly, the first two
elements are met.

b.    False as to a Material Matter

The government proved beyond a reasonable doubt that Kimble
made several substantially false entries on her 2010 federal tax
return: she claimed $5,537 in real estate taxes when she had
paid $2,452.69, and she claimed $3,580 in mortgage insurance
premiums, when she had paid none.  Gov. Ex. 9m, Schedule A; Gov.
Ex. 9w; Gov. Ex. 8b at 29; Tr. 373:1, 373:16-374:2.  Because of
these false entries, Kimble entered inflated total itemized
deductions of $59,928 on line 40a of her 2010 federal tax
return.  Gov. Ex. 9m, line 40a.  This amount was material
because it increased Kimble's refund by $3,339.  Gov. Ex. 9p.
Further, Kimble knew that the entries--and, thus, the total
itemized deductions amount--were false because her mortgage
provider had sent her a 2010 Form 1098 with the correct amounts.
*See* Gov. Ex. 9w.  Accordingly, the third element is met.

c.    Willfulness

As explained above, the combination of Kimble's experience,
the amount of the false entries, and her pattern of using false
itemized deductions to generate an increased refund--in this
case, $3,339 more than she should have received--demonstrates

Kimble's willfulness beyond a reasonable doubt.  Additionally,
Kimble concealed $22,174.68 in income obtained by keeping
portions of other people's refunds.  Gov. Ex. 9m at 2; Gov. Ex.
9o.  Accordingly, the fourth element is met.  The Court will
find Kimble guilty on count ten.

        2.    Count Eleven

              a.    Making and Subscribing to a Tax Return Under
                    Penalty of Perjury

The government proved beyond a reasonable doubt that Kimble
prepared and--on May 21, 2012--electronically signed and filed
her 2011 federal tax return under penalty of perjury.  Gov. Ex.
9n at 4; Gov. Ex. 9s at 36; Tr. 375:2-6.  Accordingly, the first
two elements are met.

              b.    False as to a Material Matter

The government proved beyond a reasonable doubt that Kimble
made several substantially false entries on her 2011 federal tax
return: she claimed $3,281 in real estate taxes and $4,006 in
home mortgage interest, when she had paid $2,411.09 and
$1,759.78, respectively, and she claimed $3,174 in mortgage
insurance premiums, when she had paid none.  Gov. Ex. 9n,
Schedule A; Gov. Ex. 9x; Gov. Ex. 8b at 39; Tr. 380:21-381:20,
382:12-19.  Because of these false entries, Kimble entered
inflated total itemized deductions of $21,725 on line 40 of her
2011 federal tax return.  Gov. Ex. 9n, line 40.  This amount was

material because it increased Kimble's refund by $3,172.   Gov.
Ex. 9p.   Further, Kimble knew that the entries--and, thus, the
total itemized deductions amount--were false because her
mortgage provider had sent her a 2011 Form 1098 with the correct
amounts.   *See* Gov. Ex. 9x.   Accordingly, the third element is
met.

       c.   Willfulness

    Similar to count ten, the combination of Kimble's
experience, the amount of the false entries, and her pattern of
using false itemized deductions to generate an increased refund-
-in this case, $3,172 more than she should have received--
demonstrates Kimble's willfulness beyond a reasonable doubt.
Additionally, Kimble concealed $41,016.15 in income obtained by
keeping portions of other people's refunds.   Gov. Ex. 9n at 4;
Gov. Ex. 9o.   Accordingly, the fourth element is met.   The Court
will find Kimble guilty on count eleven.

    E.   Counts Twelve to Sixteen: Tax Fraud (26 U.S.C.
       § 7206(2))

    Section 7206(2) bars willfully aiding, assisting,
procuring, counseling, or advising the preparation or
presentation under the internal revenue laws, a materially false
or fraudulent return, affidavit, claim, or other document,
"whether or not such falsity or fraud is with the knowledge or
consent of the person authorized or required to present such

75

return, affidavit, claim, or document." 26 U.S.C.
§ 7206(2)(2012). To establish tax fraud under § 7206(2), the
government must prove that "(1) the defendant aided, assisted,
or otherwise caused the preparation and presentation of a
return; (2) that the return was fraudulent or false as to a
material matter; and (3) the act of the defendant was willful."
*Aramony*, 88 F.3d at 1382; *United States v. Kamalu*, 298 F. App'x
251, 255 (4th Cir. 2008). Materiality and willfulness are
interpreted alike under § 7206(1) and § 7206(2). *Pomponio*, 429
U.S. at 12, 97 S. Ct at 24; *Aramony*, 88 F.3d at 1382, n.8;
*Rogers*, 853 F.2d at 251 n.2.

Kimble contends that she cannot be held liable under
§ 7206(2) because the statute "assumes the presence of a
principal and the aider or assister being a different person,"
and "[t]he government's theory is that [Kimble] did everything."
ECF No. 87 at 11-12. The government contends that Kimble has
misunderstood § 7206(2). ECF No. 89 at 9.[65] The government is
correct.

---

[65] The government relies on *United States v. Nealy*, 729 F.2d 961
(4th Cir. 1984), which states that "[a]ll that is required is
that [the defendant] knowingly participate in providing
information that results in a materially fraudulent tax return,
whether or not the taxpayer is aware of the false statements,"
729 F.2d at 963 (internal quotation marks and citation omitted).
There, however, the Fourth Circuit was explaining the
requirement for conviction "even though [the defendant] did not
actually prepare [the tax return at issue]." *Id.*

In explaining the difference between § 7206(1) and
§ 7206(2), the Fourth Circuit has stated that "[s]ubsection (1)
directly prohibits false statements *by the taxpayer* while
subsection (2) applies to those, *such as tax preparers*, who aid
or assist the taxpayer in making such statements." *United
States v. Rogers*, 853 F.2d 249, 251 n.2 (4th Cir. 1988)
(emphasis added).  The elements of the offense stated in *Aramony*
support this interpretation: one who prepares a tax return
"causes" its preparation; one who prepares and files tax returns
for others "assists" those persons in the preparation and
presentation of returns.

In a case presenting facts remarkably similar to this case,
the Fourth Circuit affirmed the conviction under § 7206(2) of a
tax preparer who--unbeknownst to the taxpayers--claimed
fraudulent deductions to increase their refunds.  *See United
States v. Jennings*, 51 F. App'x 98, 99 (4th Cir. 2002)
(unpublished).[66]  In *Jennings*, the IRS reviewed about 90 returns
prepared by the defendant, and discovered "that the itemized
deductions on the returns were disproportionately high in
relation to the adjusted gross income of the taxpayers," 51 F.
App'x at 99.  After conducting full investigations of 23 tax

---

[66] *Accord United States v. Conlin*, 551 F.2d 534, 536 (2d Cir.
1977) (affirming conviction of tax preparer under § 7206(2) who
received accurate information from clients but who claimed false
deductions and "padded" legitimate deductions).

returns, the IRS obtained affidavits (and, subsequently, trial testimony) from taxpayers who were unaware of--and ineligible for--the fraudulent deductions. *Id*. In affirming the conviction, the Fourth Circuit stated that "the jury could have readily found that the returns were 'fraudulent' or 'false' on their face" because of the disproportionately high amount of the itemized deductions, and the jury could have inferred willfulness from the defendant's "repeated pattern of failing to obtain sufficient documentation despite the obvious disproportion between the deductions and available income on the returns." *Id*. at 100 (internal quotation marks and citation omitted).

Statements by other courts also imply that § 7206(2) applies to tax preparers. *See, e.g., United States v. Crum*, 529 F.2d 1380, 1382 (9th Cir. 1976) (rejecting the argument that § 7206(2) "applies only to preparers of tax returns"); *United States v. Maius*, 378 F.2d 716, 718 (6th Cir. 1967)("The fact that appellant did not sign or file the tax returns is not material."); *United States v. Siegel*, 472 F. Supp. 440, 443-44 (N.D. Ill. 1979)("[T]he scope of the statute extends to all parties of a scheme which results in the filing of a false return, *whether or not those parties actually prepare it*.") (emphasis added). Accordingly, Kimble's argument is unavailing;

78

the Court will determine whether the government has proven each count beyond a reasonable doubt.

      1.    Count Twelve

          a.    Aided, Assisted, or Caused the Preparation or Presentation of a Return

The government proved beyond a reasonable doubt that Kimble prepared and--on February 18, 2010--electronically filed Fendlay's 2009 federal tax return. Gov. Ex. 4e; Gov. Ex. 9s at 1; Gov. Ex. 12 ¶ 6; Tr. 347:21-25. Fendlay had been referred to Kimble by her then-granddaughter-in-law, Cheswick, for whom Kimble had been preparing tax returns. Tr. 80:24-81:10, 99:20, 100:8-15. Through Cheswick, Fendlay gave Kimble her tax-related documents, and paid her $25 to prepare the return. Gov. Ex. 4a; Tr. 81:7-10, 101:1-5. Fendlay confirmed that Kimble had used her name, address, and social security number to prepare the return, and filed it electronically using Fendlay's name and date of birth. Tr. 105:21-106:10, 110:17. Accordingly, Kimble aided, assisted, or caused the preparation and presentation of Fendlay's 2009 federal tax return.

          b.    Materially False or Fraudulent

The government proved beyond a reasonable doubt that Kimble falsely claimed $30,399 in itemized deductions in Fendlay's 2009 federal tax return, generating an inflated refund of $7,223. Gov. Ex. 4e, line 73a, Schedule A; Gov Ex. 8d at 6; Gov. Ex. 9q;

Tr. 81:7-10, 109:9, 186:18-24, 338:8-339:25.  Accordingly,
Kimble made a materially false statement.

                c.   Willfulness

The government proved beyond a reasonable doubt that Kimble
willfully gave Fendlay a "dummy" tax return to disguise the fact
that she had filed a fraudulent return with the IRS, kept most
of the refund derived from the fraudulent return, misled Fendlay
about the amount of her refund, and lied when Cheswick inquired
about the returns filed with the IRS.  Gov. Ex. 3j; Gov. Ex. 3l;
Gov. Ex. 3n; Gov. Ex. 4b; Gov. Ex. 4d; Gov. Ex. 9o; Gov. Ex. 12
¶ 3; Tr. 88:23-24, 104:25, 109:21, 111:5-12.  Accordingly, the
Court will find Kimble guilty on count twelve.

           2.   Count Thirteen

                a.   Aided, Assisted, or Caused the Preparation
                     or Presentation of a Return

The government proved beyond a reasonable doubt that Kimble
prepared and--on February 24, 2010--electronically filed
Thompson's 2009 federal tax return.  Gov. Ex. 6h at 11; Tr.
145:17-19,150:22-24, 158:3-5, 349:7-8.  Thompson had given
Kimble her W-2 and IRA statement for the 2009 tax year.  Tr.
151:3-12, 168:11-19.  Thompson confirmed that Kimble had used
her name, address, and social security number to prepare the
return.  Tr. 157:16-158:1.  Accordingly, Kimble aided, assisted,

or caused the preparation and presentation of Thompson's 2009
federal tax return.

### b.   Materially False or Fraudulent

The government proved beyond a reasonable doubt that Kimble
falsely claimed $16,229 in itemized deductions in Thompson's
2009 federal tax return, generating an inflated refund of
$1,653.  Gov. Ex. 6h, lines 40a, 72, Schedule A; Tr. 151:3-12,
153:14-25, 157:4-7, 168:11-19.  Accordingly, Kimble made a
materially false statement.

### c.   Willfulness

The government proved beyond a reasonable doubt that Kimble
willfully gave Thompson a "dummy" tax return to disguise the
fact that she had filed a fraudulent return with the IRS and
kept most of the refund derived from the fraudulent return.
Gov. Ex. 6g; Gov. Ex. 6h, line 73d; Gov. Ex. 9o; Tr. 151:15-
152:1, 332:11-333:3, 335:13-17, 335:22-336:15.  Further, Kimble
repeatedly made false entries on Thompson's tax returns: Kimble
had also claimed a false student loan interest deduction on
Thompson's 2008 federal tax return.  Gov. Ex. 6c, line 18; Tr.
145:17-22, 148:1-14.  Accordingly, the Court will find Kimble
guilty on count thirteen.

3.    Count Fourteen

    a.    Aided, Assisted, or Caused the Preparation
        or Presentation of a Return

The government proved beyond a reasonable doubt that Kimble prepared and--on February 27, 2011--electronically filed Fendlay's 2010 federal tax return.  Gov. Ex. 4m; Gov. Ex. 9s at 15; Tr. 113:22-114:4, 349:4-5.  As for the 2009 tax year, Fendlay gave Kimble her tax-related documents.  Gov. Ex. 4h; Tr. 112:24-113:2.  Fendlay confirmed that Kimble had used her name, address, and social security number to prepare the return, and filed it electronically using Fendlay's name and date of birth. Gov. Ex. 4m; Gov. Ex. 9s at 15; Tr. 113:22-114:4, 116:25, 349:4-5.  Accordingly, Kimble aided, assisted, or caused the preparation and presentation of Fendlay's 2010 federal tax return.

    b.    Materially False or Fraudulent

The government proved beyond a reasonable doubt that Kimble falsely claimed $19,953 in itemized deductions in Fendlay's 2010 federal tax return, generating an inflated refund of $5,306. Gov. Ex. 4m, line 40a, Schedule A; Gov. Ex. 9q; Tr. 114:9-115:8, 341:2-344:2.  Accordingly, Kimble made a materially false statement.

c.    Willfulness

The government proved beyond a reasonable doubt that Kimble willfully gave Fendlay a "dummy" tax return to disguise the fact that she had filed a fraudulent return with the IRS, kept most of the refund derived from the fraudulent return, misled Fendlay about the amount of her refund, and lied when Cheswick inquired about the refunds filed with the IRS.  Gov. Ex. 4i, line 74a, 74d; Tr. 115:13-17, 117:8-24.  Additionally, Kimble consistently prepared tax returns with false itemized deductions that increased the refund, which she then kept.  Accordingly, the Court will find Kimble guilty on count fourteen.

4.    Count Fifteen

a.    Aided, Assisted, or Caused the Preparation
or Presentation of a Return

The government proved beyond a reasonable doubt that Kimble prepared and--on April 15, 2011--electronically filed Thompson's 2010 federal tax return.  Gov. Ex. 6k; Tr. 349:12-16.  Thompson had given Kimble her W-2, a dividend statement, an IRA statement, and a letter confirming a $255 charitable donation. Gov. Ex. 6i; Tr. 158:10-159:4.  Thompson confirmed that Kimble had used her name, address, and social security number to prepare the return.  Tr. 163:19-164:1.  Accordingly, Kimble aided, assisted, or caused the preparation and presentation of Thompson's 2010 federal tax return.

83

b.    Materially False or Fraudulent

The government proved beyond a reasonable doubt that Kimble

falsely claimed $15,236 in itemized deductions in Thompson's

2009 federal tax return, generating an inflated refund of

$6,156.  Gov. Ex. 6i; Gov. Ex. 6k, line 40, Schedule A; Tr.

158:10-159:4, 160:22-162:16.  Accordingly, Kimble made a

materially false statement.

c.    Willfulness

The government proved beyond a reasonable doubt that Kimble

willfully gave Thompson a "dummy" tax return to disguise the

fact that she had filed a fraudulent return with the IRS and

kept some of the refund derived from the fraudulent return.

Gov. Ex. 6j, line 74a; Gov. Ex. 9o; Tr. 159:5-160:4.  Further,

Kimble repeatedly made false entries on Thompson's and others'

tax returns without their consent or knowledge.  Accordingly,

the Court will find Kimble guilty on count fifteen.

5.    Count Sixteen

a.    Aided, Assisted, or Caused the Preparation
      or Presentation of a Return

The government proved beyond a reasonable doubt that Kimble

prepared and--on April 15, 2011--electronically filed Zuljich's

2010 federal tax return.  Gov. Ex. 5d at 11; Tr. 349:22-350:5.

Kimble offered to prepare Zuljich's taxes, and Zuljich paid her

$50 to do so.  Tr. 124:20-125:18.  Zuljich gave Kimble her tax-

related documents to prepare the return.  Gov. Ex. 5b; Tr. 125:25-128:4.  Zuljich confirmed that Kimble had used her name, address, and social security number to prepare the return, and filed it electronically using Zuljich's date of birth.  Tr. 130:17-131:2.  Accordingly, Kimble aided, assisted, or caused the preparation and presentation of Zuljich's 2010 federal tax return.

  b.   Materially False or Fraudulent

The government proved beyond a reasonable doubt that Kimble falsely claimed $16,535 in itemized deductions in Zuljich's 2010 federal tax return, generating an inflated refund of $4,389. Gov. Ex. 5b; Gov Ex. 5d, lines 40a, 66, Schedule A; Tr. 132:3-135:15, 189:15-190:2.  Accordingly, Kimble made a materially false statement.

  c.   Willfulness

The government proved beyond a reasonable doubt that--as in counts 12-15--Kimble willfully gave Zuljich a "dummy" tax return to disguise the fact that she had filed a fraudulent return with the IRS, kept most of the refund derived from the fraudulent return, and misled Zuljich about the amount of her refund.  Gov. Ex. 5c; Gov. Ex. 5d, Form 8888; Gov. Ex. 5f; Gov. Ex. 9o; Tr. 128:5-12, 129:5-23, 136:4-15.  Accordingly, the Court will find Kimble guilty on count sixteen.

> F.   Counts Seventeen to Twenty: Aggravated Identity Theft
>      (18 U.S.C. § 1028A)

Section 1028A bars (1) knowingly transferring, possessing, or using a means of identification of another person, (2) without lawful authority, (3) during, and in relation to, a predicate felony offense--in this case, wire fraud.  28 U.S.C. § 1028A(a)(1),(c)(5); *Abdelshafi*, 592 F.3d at 607.

The defendant must know that the means of identification belongs to another, and that they are using, transferring, or possessing it.  *Flores-Figueroa v. United States*, 556 U.S. 646, 650-57, 129 S. Ct. 1886, 1889-94, 173 L. Ed. 2d 853 (2009). "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." *United States v. Castellanos-Loya*, 503 F. App'x 240, 241 (4th Cir. 2013) (unpublished) (*quoting* Model Penal Code § 2.02(7)).

The "means of identification" must include "an identifier or combination of identifiers" sufficiently unique to identify a specific individual; use of another's name alone may not be sufficiently unique.[67]  However, use of one's social security number is sufficiently unique.[68]

---

[67] *United States v. Mitchell*, 518 F.3d 230, 235 (4th Cir. 2008)(use of name "Marcus Jackson" not sufficiently unique when

As previously noted,[69] "without lawful authority" does not
mean that the means of identification must have been stolen;
rather, the statute proscribes using another's identity for an
unlawful purpose. *Abdelshafi*, 592 F.3d at 608.  Using another
person's means of identification "during and in relation to any
felony violation enumerated in the statute necessarily lacks a
form of authorization recognized by law," regardless of whether
the identification's true owner consents to the unlawful use.
*United States v. Otuya*, 720 F.3d 183, 189 (4th Cir. 2013) *cert.*
*denied*, 134 S. Ct. 1279, 188 L. Ed. 2d 312 (2014).[70]

---

two persons had driver's licenses issued in that name in the
State of Georgia; errors in other identifiers on fake license
meant that no valid unique identifier had been established);
*Abdelshafi*, 592 F.3d at 605, 607 n.3 ("a means of identification
is . . . any name or number that may be used, alone or in
conjunction with any other information, to identify a specific
individual"; affirming conviction under § 1028A when defendant
used another person's "name, date of birth, Medicaid
identification number, date of service, pick-up and drop-off
locations, and number of miles traveled").

[68] *See Castellanos-Loya*, 503 F. App'x at 241 (defendant did not
dispute that a social security number was a "means of
identification"); *United States v. Cain*, 355 F. App'x 758, 759
(4th Cir. 2009) (unpublished) (social security number is a means
of identification; remanding for determination whether defendant
knew that the social security number belonged to another).

[69] *See supra* Section II.A.2.

[70] *Accord United States v. Lumbard*, 706 F.3d 716, 722-25 (6th
Cir. 2013); *United States v. Ozuna-Cabrera*, 663 F.3d 496, 499
(1st Cir. 2011); *United States v. Hines*, 472 F.3d 1038, 1040
(8th Cir. 2007).

1.    Count Seventeen

a.    Knowing Transfer, Possession, or Use of a
Means of Identification of Another

The government proved beyond a reasonable doubt that

Fendlay gave Kimble several tax-related documents containing

Fendlay's name, address, and social security number, and that

Kimble used the identifying information to prepare Fendlay's

2009 federal tax return.  Gov. Ex. 4a; Gov. Ex. 4d; Tr. 105:21-

106:10, 110:17.  Accordingly, Kimble knowingly used a

sufficiently unique means of identification of Fendlay--her

name, address, and social security number--which she knew

belonged to Fendlay.

b.    Without Lawful Authority; During and in
Relation to Wire Fraud

The government proved beyond a reasonable doubt that Kimble

used Fendlay's means of identification to file a fraudulent 2009

federal tax return, thereby generating a fraudulent refund for

her own benefit, and that she did so in the course of committing

wire fraud.  Gov. Ex. 4e; *supra* Section II.C.1 (count one).

Accordingly, Kimble knowingly used Fendlay's means of

identification without lawful authority, during and in relation

to the offense of wire fraud.  The Court will find Kimble guilty

on count seventeen.

88

2.     Count Eighteen

a.     Knowing Transfer, Possession, or Use of a
Means of Identification of Another

The government proved beyond a reasonable doubt that

Thompson gave Kimble several tax-related documents containing

Thompson's name, address, and social security number, and that

Kimble used the identifying information to prepare Thompson's

2009 federal tax return.  Gov. Ex. 6f; Gov. Ex. 6h; Tr. 151:3-

12, 157:16-158:1, 168:11-19.  Accordingly, Kimble knowingly used

a sufficiently unique means of identification of Thompson--her

name, address, and social security number--which she knew

belonged to Thompson.

b.     Without Lawful Authority; During and in
Relation to Wire Fraud

The government proved beyond a reasonable doubt that Kimble

used Thompson's means of identification to file a fraudulent

2009 federal tax return, thereby generating a fraudulent refund

for her own benefit, and that she did so in the course of

committing wire fraud.  Gov. Ex. 6h; *supra* Section II.C.2 (count

two).  Accordingly, Kimble knowingly used Thompson's means of

identification without lawful authority, during and in relation

to the offense of wire fraud.  The Court will find Kimble guilty

on count eighteen.

3.    Count Nineteen

a.    Knowing Transfer, Possession, or Use of a
Means of Identification of Another

The government proved beyond a reasonable doubt that
Woodland had his Sam's Club W-2--containing his name, social
security number, and income--sent to Kimble's home address, and
that Kimble used the identifying information to prepare and file
Woodland's 2010 federal tax return and direct the refund to her
bank account.  Gov. Ex. 7a; Gov. Ex. 7b; Gov. Ex. 12 ¶ 6; Tr.
172:20-173:6, 174:6-12.  Accordingly, Kimble knowingly used a
sufficiently unique means of identification of Woodland--his
name and social security number--which she knew belonged to
Woodland.

b.    Without Lawful Authority; During and in
Relation to Wire Fraud

The government proved beyond a reasonable doubt that Kimble
used Woodland's means of identification to file a fraudulent
2010 federal tax return, thereby generating a fraudulent refund
for her own benefit, and that she did so in the course of
committing wire fraud.  Gov. Ex. 7a; *supra* Section II.C.3 (count
three).  Accordingly, Kimble knowingly used Woodland's means of
identification without lawful authority, during and in relation
to the offense of wire fraud.  The Court will find Kimble guilty
on count nineteen.

90

4.   Count Twenty

a.   Knowing Transfer, Possession, or Use of a
     Means of Identification of Another

The government proved beyond a reasonable doubt that

Kuljich gave Kimble several tax-related documents containing

Kuljich's name, address, and social security number, and that

Kimble used the identifying information to prepare Kuljich's

2010 federal tax return.  Gov. Ex. 5b; Gov. Ex. 5d; Tr. 125:25–

128:4, 130:17-131:2.  Accordingly, Kimble knowingly used a

sufficiently unique means of identification of Kuljich--her

name, address, and social security number--which she knew

belonged to Kuljich.

b.   Without Lawful Authority; During and in
     Relation to Wire Fraud

The government proved beyond a reasonable doubt that Kimble

used Kuljich's means of identification to file a fraudulent 2010

federal tax return, thereby generating a fraudulent refund for

her own benefit, and that she did so in the course of committing

wire fraud.  Gov. Ex. 5d; *supra* Section II.C.6 (count six).

Accordingly, Kimble knowingly used Kuljich's means of

identification without lawful authority, during and in relation

to the offense of wire fraud.  The Court will find Kimble guilty

on count twenty.[71]

    G.    Count Twenty-One: Visa Application Fraud (18 U.S.C.
§ 1546(a))

Section 1546(a) bars knowingly subscribing as true under

oath or penalty of perjury a materially false statement in an

immigration document.  18 U.S.C. § 1546(a)(2012).  The elements

of visa application fraud are: (1) the defendant made a false

statement in an immigration document; (2) the false statement

---

[71] At the close of evidence, Kimble made a pro forma motion for
judgment of acquittal.  Tr. 113:17-23; *see* Fed. R. Crim. P.
29(a) (providing that "[a]fter the government closes its
evidence or after the close of all the evidence, the court on
the defendant's motion must enter a judgment of acquittal of any
offense for which the evidence is insufficient to sustain a
conviction").  A motion under Rule 29 challenges the sufficiency
of the evidence to support the conviction.  The Court must
determine whether, "viewing the evidence in the light most
favorable to the government, any rational trier of fact could
[find] the defendant guilty beyond a reasonable doubt."  *United
States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008).

The government argues that there is sufficient evidence
supporting each of the counts.  ECF No. 84 at 8-9.  Kimble
concedes that, "for Rule 29 purposes," there is sufficient
evidence on count 21 (visa application fraud), but asserts that
"by reason of the argument set forth in the Motion to Suppress,"
the Court should grant her motion as to all other counts because
"all evidence obtained as a result [of her statement would] not
be accepted as evidence."  ECF No. 87 at 7.

As explained above, the Court has denied Kimble's motion to
suppress her statement.  *See supra* Section II.B.  Further,
because the Court has determined that there is sufficient
evidence to support Kimble's convictions on counts one to twenty
beyond a reasonable doubt, Kimble's Rule 29 motion will be
denied.

was made knowingly; (3) the statement was material to the

Immigration and Naturalization Service's ("INS") decision; (4)

the statement was made under oath or penalty of perjury; and (5)

"the statement was made . . . in an application required by . .

. [United States] immigration laws or regulations." *United*

*States v. Chu*, 5 F.3d 1244 (9th Cir. 1993); *United States v.*

*O'Connor*, 158 F. Supp. 2d 697, 720 (E.D. Va. 2001).

1.    False Statement in an Immigration Document

The government proved beyond a reasonable doubt that--on

February 22, 2008--Kimble filed an I-130 petition for alien

relative in which she falsely stated that Mamah and Wright had

divorced in January 2008, and she and Mamah had married on

February 14, 2008.   Gov. Ex. 10n, lines 8, 12; Tr. 240:10-14,

408:13-17.   Mamah and Wright were not divorced until March 2008,

and, thus, in February 2008, Mamah and Kimble had not entered

into a legal marriage under Maryland law.   Gov. Ex. 10g; Tr.

236:7-16; Maryland Code Ann., Crim. Law § 10-502(b).[72]

---

[72] At the end of its case-in-chief, the government asked the
Court to take judicial notice of Maryland Code Ann., Crim. Law §
10-502(b) (West 2014), which bars a married person from entering
into a marriage with another person.   Tr. 425:22-426:1.   Kimble
agrees that judicial notice of § 10-502(b) is appropriate.   ECF
No. 87 at 7-8.

Under Federal Rule of Evidence 201, "[t]he court may judicially
notice a fact that is not subject to reasonable dispute because
it:   1) is generally known within the trial court's
jurisdiction; or 2) can be accurately and readily determined

Accordingly, Kimble made false statements in an immigration document.

    2.   Made Knowingly

    "To act 'knowingly' means to act intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness."  *United States v. Archer*, 671 F.3d 149, 159 (2d Cir. 2011).  Knowing conduct may be established from circumstantial evidence.  *United States v. Galindo*, No. 11-10117-EFM, 2012 WL 1945142, at *4 (D. Kan. May 30, 2012).

    The government proved beyond a reasonable doubt that Kimble knowingly made false statements in the I-130 petition. Kimble had drafted Mamah's complaint for absolute divorce from Wright, the affidavit of service, and Wright's purported answer, and all handwriting on those documents is hers.  Gov. Ex. 12 ¶ 8.  Additionally, Kimble attached to the I-130 petition an incomplete judgment of absolute divorce purporting to have dissolved Mamah and Wright's marriage on February 5, 2008, but

---

from sources whose accuracy cannot reasonably be questioned." Further, "[t]he court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information."  *Id.*  Section 10-502 meets Rule 201's requirements: it is "generally known within the trial court's territorial jurisdiction[,]" which is contiguous with the geographic boundaries of the State of Maryland, and it can "be accurately and readily determined from [a] source[] whose accuracy cannot reasonably be questioned"--the Maryland Code. Accordingly, the Court will take judicial notice.

attached two completed judgments of absolute divorce from her
previous marriages.  Gov. Ex. 10a at 65-68.  Thus, Kimble
clearly knew that Mamah and Wright's divorce proceedings were
fraudulent, the incomplete judgment was not proof that Mamah and
Wright's marriage had been dissolved, and they were not divorced
when she filed the I-130 petition.  The inclusion of the
incomplete judgment of divorce purportedly predating Kimble and
Mamah's marriage with the completed judgments is strong evidence
that Kimble knew that for the USCIS to find their marriage
legally valid, she had to show that Mamah and Wright had
divorced before February 14, 2008; thus, Kimble knew that she
and Mamah were not legally married because Mamah and Wright had
not divorced before February 14, 2008.  Accordingly, Kimble
knowingly made false statements in the I-130 petition.

    3.   Material to the INS

A false statement is material if disclosure of the true
facts might lead to denial of the application.  *United States v.
Zhen Zhou Wu*, 711 F.3d 1, 30 (1st Cir.) *cert. denied sub nom.
Yufeng Wei v. United States*, 134 S. Ct. 365, 187 L. Ed. 2d 160
(2013) (*quoting United States v. Fedorenko*, 597 F.2d 946, 951
(5th Cir. 1979))(statement by USCIS adjudicator sufficient to
establish materiality).

USCIS adjudicator Whiteside testified that statements about marriage and divorce in an I-130 petition allow adjudicators to determine whether the qualifying relationship that is claimed is legally valid, and that a representation that the petitioner had married applicant while the applicant was married to another person would result in the denial of the application.  Tr. 415:16-416:12.  Accordingly, the government proved beyond a reasonable doubt that Kimble's false statements were material, because had she been truthful, her petition in support of Mamah's permanent residency would have been denied.

4.   Under Oath or Penalty of Perjury

The government proved beyond a reasonable doubt that Kimble certified, under penalty of perjury, that Mamah and Wright's marriage had ended in January 2008, and that she and Mamah had married on February 14, 2008, when she signed the petition stating that the information was being submitted under penalty of perjury.  Gov. Ex. 10n, lines 8, 12; Tr. 406:8-408:9.

5.   Application Required by Immigration Laws or Regulations

U.S. Citizen spouses may, by statute, petition for an alien spouse's change of status.  *See* 8 U.S.C. §§ 1153, 1154.  The government proved beyond a reasonable doubt that Kimble made false statements in an application required by immigration laws or regulations as they were made in her I-130 petition in

96

support of Mamah's change of status, which she filed on February 22, 2008 and USCIS received on March 21, 2008.  Gov. Ex. 10n; Tr. 240:10-14, 408:13-17.  Accordingly, the Court will find Kimble guilty on count twenty-one.

III. Conclusion

For the reasons stated above, the Court will find the Defendant Karen Kimble guilty on all counts.


_____7/8/15_____
Date

_____
William D. Quarles, Jr.
United States District Judge